**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **RICCA PRASAD**<br>2003 CHESTNUT ST.<br>PHILADELPHIA, PA 19103<br><br>*Plaintiff*,<br><br>*v*.<br><br>**THE GEORGE WASHINGTON UNIVERSITY**<br>2121 I (EYE) STREET. NW<br>WASHINGTON, DC 20052<br><br>*Defendant*. | Civil Action No. 1:15-cv-1779 |

**COMPLAINT FOR DECLARATORY, INJUNCTIVE AND COMPENSATORY RELIEF**

**INTRODUCTION**

1. Plaintiff Ricca Prasad brings this action against Defendant The George Washington University (GWU) under Title IX, 20 U.S.C. § 1681(a), and for breach of contract, promissory estoppel, negligent infliction of emotional distress, and negligent retention, as a result of GWU's failure to promptly and appropriately investigate and address her sexual harassment by another GWU student.

2. As a student at GWU, Ms. Prasad endured severe sexual harassment and physical assault at the hands of "VT," another GWU student. GWU's response to these issues was both procedurally flawed and inadequate to prevent foreseeable future harm. Director of GWU's Office of Student Rights and Responsibilities, Gabriel Slifka, treated Ms. Prasad with callous disregard and then misrepresented the school's actions regarding the disciplinary measures it had taken against VT.

3. As a direct result, Ms. Prasad was subjected to further sexual harassment, loss of educational benefits, and severe emotional distress, resulting in the development of post-traumatic stress disorder (PTSD). She therefore seeks appropriate relief from the Court.

## PARTIES

4. Plaintiff Ricca Prasad is an individual residing in Philadelphia, PA, and was previously enrolled at George Washington University for joint undergraduate and graduate degrees from September 2010 until May 2015.

5. Defendant The George Washington University is an educational institution located in Washington, DC, established in 1821, that confers both graduate and undergraduate degrees and receives federal funding.

## JURISDICTION AND VENUE

6. This Court has jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. § 1331 and under Title IX, 20 U.S.C. § 1681(a).

7. Venue is appropriate pursuant to 28 U.S.C. § 1391(b) because the actions giving rise to this claim occurred in Washington, DC.

## FACTUAL ALLEGATIONS

8. Ms. Prasad was enrolled as a joint degree student at GWU from September 2010 through May 2015.

9. Ms. Prasad began dating VT, a fellow undergraduate student, in February 2011, when she was a freshman.

10. While Ms. Prasad and VT were dating, VT persistently harassed Ms. Prasad through text messages and emails, varying between threats and declarations of love.

11. Ms. Prasad ended her relationship with VT in January 2012.

12. After the end of the relationship, VT's harassment became even more aggressive, including making death threats and detailed threats of other physical violence against Ms. Prasad and others.

13. Ms. Prasad filed an Incident Report complaining about VT's abuse and harassment with the George Washington University Police Department (GWPD) on January 17, 2012.

14. While meeting with GWPD on January 17, 2012, GWPD advised Ms. Prasad to change her email address so that she would not continue to be subjected to VT's harassing emails.

15. Following GWPD's advice, Ms. Prasad contacted GWU technological services, requesting to change her email address.

16. GWU technological services stated that GWU's policy was that no student could change their email address.

17. Instead, they recommended that she filter VT's messages into her trash folder.

18. This method for avoiding the harassment quickly proved ineffective as VT created multiple new email addresses, easily bypassing the filters and subjecting Ms. Prasad to more harassing emails.

19. After having filed the report with GWPD, an administrator from the Office of Student Rights and Responsibilities (OSRR), Lindsay McConnell, contacted Ms. Prasad and subsequently met with her to discuss the events in the Incident Report.

20. During this meeting, Ms. Prasad provided OSRR with copies of some of the threatening communications sent to her by VT.

21. At this meeting, Ms. McConnell failed to connect Ms. Prasad with Title IX services or counseling.

22. On January 25, 2012, OSRR issued a "No Contact Order," an administrative letter sent separately to both parties.

23. The No Contact Order stated that, effective immediately, neither party was allowed to "speak to or in any fashion attempt to contact" the other party, whether "in person, by phone, via email, via any means of technology (e.g. Facebook, internet messages, etc.) or through friends . . . ."

24. The No Contact Order also stated that "[f]ailure to comply with this direction may result in disciplinary charges being brought . . . by the University."

25. After a year, Ms. Prasad and VT mutually agreed to rescind the No Contact Order, and it was formally removed by OSRR on January 3, 2013.

26. After the No Contact Order was removed, VT sent numerous threatening emails and text messages to Ms. Prasad.

27. On several occasions, VT alluded to Ms. Prasad that, during their freshman year, he had raped her while she was unconscious.

28. On the evening of Saturday, March 30, 2013, Ms. Prasad agreed to meet with VT at a nearby park.

29. At the park, Ms. Prasad confronted VT and begged him to stop the threats and harassment.

30. When Ms. Prasad attempted to leave, VT grabbed Ms. Prasad's purse, physically restrained her, pinned her precariously against a railing over a highway, and repeatedly screamed in her face "I raped you! I raped you!"

31. Ms. Prasad struggled and was eventually able to break free from VT and fled back to her dormitory while VT chased after her, screaming and grabbing at her.

32. VT pursued Ms. Prasad, twice tackling her to the ground, until Ms. Prasad was able to escape into her dormitory.
33. The following Monday, April 1, 2013, Ms. Prasad reported the assault to GWPD.
34. The Area Coordinator of GWU's Center for Student Engagement issued a new No Contact Order. A physical copy was given to Ms. Prasad and OSSR was provided with a copy of the full GWPD report.
35. The Area Coordinator specifically alerted Gabriel Slifka, the director of OSRR, about the incident.
36. The Area Coordinator called Mr. Slifka to ask if Ms. Prasad could report the incident without divulging VT's name, and Mr. Slifka represented that OSRR would not take action without that information.
37. On April 8, 2013, a week after Ms. Prasad's report, Mr. Slifka contacted Ms. Prasad to schedule a meeting regarding the incident.
38. During their meeting, Ms. Prasad informed Mr. Slifka about VT's history with substance abuse, the ongoing nature of the threat against her, and the concern she felt for her safety.
39. Contradicting his previous statement relayed to the Area Coordinator, Mr. Slifka now stated that OSRR would take action without VT's name.
40. Mr. Slifka treated the matter with disinterest and callousness and portrayed GWPD as Ms. Prasad's sole resource at the school for addressing the situation.
41. Mr. Slifka stated during the meeting that GWU usually responds to student assault with a three-year suspension.

42. Mr. Slifka mentioned Ms. Prasad's previous romantic involvement with VT as potential reason for deviating from GWU's ordinary suspension policy, and ultimately chose not to suspend him, at least partially on this basis.

43. During the meeting, Mr. Slifka failed to connect Ms. Prasad with Title IX resources or counseling.

44. Upon information and belief, other student's at GWU have previously submitted grievances regarding the inappropriate responses taken by Mr. Slifka in response to their own reports of sexual harassment.

45. In the following month, the No Contact Order proved to be an ineffective means of deterring VT, as he repeatedly violated the Order by sending more threatening, sexual, and harassing emails to Ms. Prasad.

46. Additionally, Ms. Prasad's roommate stated that she heard VT knocking on the window just outside Ms. Prasad's first-floor dormitory bedroom window.

47. Another student informed Ms. Prasad that she had witnessed VT standing outside Ms. Prasad's window while she slept.

48. On April 24, 2013, Ms. Prasad emailed Mr. Slifka to report VT's continuing harassment and to inform him about VT appearing outside her bedroom window while she slept.

49. Mr. Slifka did not reply to Ms. Prasad's April 24, 2013, email.

50. On April 30, 2013, Ms. McConnell emailed Ms. Prasad regarding potentially submitting a formal statement for disciplinary proceedings against VT.

51. As there had been many violations of the No Contact Order at this point, Ms. McConnell was vague in specifying to which violation this formal statement should attest.

52. During this exchange, OSRR personnel again failed to connect Ms. Prasad to Title IX resources or counseling.

53. On May 3, 2013, Ms. Prasad alerted Mr. Slifka to the fact that VT had continuously been sending threatening emails since the No Contact Order had been issued.

54. Of the many threatening emails sent to her by VT, Ms. Prasad submitted nearly fifty to Mr. Slifka at this time.

55. Mr. Slifka again did not advise Ms. Prasad of her Title IX resources, and merely referred Ms. Prasad to GWPD.

56. As GWU's response had proven ineffective in protecting Ms. Prasad from further harassment, Ms. Prasad deliberately spent as much time as possible away from Washington, DC, in order to avoid VT.

57. OSRR finally initiated official disciplinary proceedings against VT in May 2013, and held a hearing on May 21, 2013.

58. Ms. Prasad was given less than a week's notice of the hearing, which was scheduled almost two months after VT physically assaulted her.

59. Due to the short notice GWU gave of the hearing, and because Ms. Prasad had a prior, non-refundable flight home, Ms. Prasad had to participate in the hearing solely via telephone.

60. Ms. Prasad never received written notice of the outcome of VT's disciplinary hearing.

61. On June 14, 2013, Ms. Prasad emailed OSRR to ask about the outcome of the hearing but never received a reply.

62. After making multiple follow-up phone calls to OSRR, Mr. Slifka finally told Ms. Prasad, via telephone, that VT had been suspended for two years and that the 2013 No Contact Order would remain in place for those two years.

63. During that conversation, Mr. Slifka again indicated to Ms. Prasad that she would need to contact GWPD for any further concerns regarding VT's conduct.

64. Relying on the information provided to her by Mr. Slifka, specifically his representation that VT was suspended, Ms. Prasad declined to pursue other legal remedies.

65. Despite Mr. Slifka's representations that GWU had taken disciplinary action against VT, the harassment continued.

66. On July 22, 2013, Ms. Prasad filed yet another report with GWPD regarding continued harassment since the time the 2013 No Contact Order had been put in place.

67. As part of filing this report, Ms. Prasad submitted thirty-one pages of harassing emails to GWPD.

68. Upon information and belief, these emails were forwarded from GWPD to Mr. Slifka.

69. OSRR never followed up with Ms. Prasad regarding this GWPD report and declined to bring further disciplinary charges against VT, even though such charges were contemplated by the existing No Contact Order.

70. Having graduated from her undergraduate program in May 2013, Ms. Prasad returned to GWU's campus at the end of August 2013 to begin her graduate studies.

71. Due to GWU's refusal to effectively protect Ms. Prasad against VT, Ms. Prasad filed a petition for a Civil Protection Order against VT with the Superior Court of the District of Columbia.

72. On September 30, 2013, the Superior Court granted Ms. Prasad a Temporary Protection Order against VT.

73. Upon information and belief, VT did not violate the Temporary Protection Order.

74. VT's attorney provided Ms. Prasad with a copy of a contract VT had signed with GWU.

75. The contract, dated October 29, 2013, and signed by VT on November 4, 2013, stipulated that, in order for VT to receive his degree, he must remain in compliance with the No Contact Order for three years from the date of the contract, and he must not violate any other university policy.

76. Believing that this contract would sufficiently deter VT from continued violation of the No Contact Order, Ms. Prasad chose to drop her petition for a Civil Protection Order.

77. Nevertheless, in December 2013, VT resumed violating the No Contact Order.

78. VT continuously harassed Ms. Prasad by phone, email, and various social media for the next fourteen months, despite Ms. Prasad's pleas for VT to stop.

79. Ms. Prasad believed that these violations of the No Contact Order would constitute a breach of the contract between VT and GWU, resulting in VT being unable to receive his degree.

80. Following the advice she had been given by OSRR, Ms. Prasad filed yet another report with GWPD in January 2014 regarding the harassment, and the report was sent to OSRR.

81. OSRR again failed to refer Ms. Prasad to Title IX resources.

82. Ms. Prasad underwent extensive counseling as a means of addressing the emotional and psychological toll that VT's harassment and GWU's indifference had taken on her.

83. As a direct result of the continued harassment and GWU's indifference, Ms. Prasad was diagnosed with PTSD in February 2014.

84. Ms. Prasad suffered from severe sleep deprivation, anxiety, and night terrors, necessitating treatment with anti-depressants and prescription sleeping pills.

85. In light of the ineffectiveness of GWU's No Contact Order and OSRR's unresponsiveness, Ms. Prasad personally negotiated with her professors so she could spend the fall 2014 semester studying remotely in Florida in an attempt to conceal her physical location from VT.

86. While in Florida, Ms. Prasad filed a cyberstalking report regarding VT's continued harassment with the local Florida police department.

87. Studying remotely hindered Ms. Prasad's access to educational opportunities, as she was only able to participate in one class specific to her degree program and her participation was limited to Skype.

88. She was unable to ask questions during class or to participate in required group projects, and could not clearly see the board at the front of the classroom.

89. Additionally, Ms. Prasad declined to take certain elective courses in her graduate program because she did not feel safe on campus.

90. These hindrances resulted in Ms. Prasad receiving a grade significantly lower than her average grades.

91. Throughout 2014, VT's cyber harassment persisted, with Ms. Prasad receiving approximately one hundred more unsolicited emails.

92. On November 14, 2014, Ms. Prasad received an email from VT on a personal email account which she believed VT had no knowledge of.

93. Alarmed, Ms. Prasad again contacted GWPD on November 14, 2014, now for the fifth time, once more informing them of VT's regular violations of the No Contact Order.

94. Ms. Prasad and Ms. Prasad's mother contacted several different GWU offices, including OSRR, eleven times over the three weeks after Ms. Prasad's latest GWPD report before they received any response.

95. The Victim's Services Coordinator who finally returned Ms. Prasad's call told her that the agreement between VT and GWU, which had made compliance with the No Contact Order a condition of his receiving his degree, was no longer valid.

96. The Victim's Services Coordinator also told Ms. Prasad that OSRR had likely been unresponsive to her attempts to contact them because GWU's General Counsel had instructed GWU staff not to communicate with Ms. Prasad.

97. Upon information and belief, VT had already been conferred a degree by GWU. The GWU alumni website states that VT received a B.A. in Sociology from GWU in May 2013.

98. VT received this degree despite being found guilty of physical assault and abuse during his May 2013 hearing and despite the contract between VT and GWU stating that his graduation was dependent on VT not violating the No Contact Order.

99. According to GWU's *Sexual Harassment and Sexual Violence Policy and Procedures*:

> When allegations of sexual harassment are addressed through administrative review or the formal hearing procedure, both parties will receive concurrent written notice of the outcome. When either procedure results in a determination that sexual harassment occurred, the findings and recommendations shall be referred to the appropriate university official for imposition of corrective action and sanctions as appropriate.

100. In March 2015, Ms. Prasad once again filed a petition for a Civil Protection Order against VT, which was granted.

101. To date, VT has not violated the Civil Protection Order.

## FIRST CAUSE OF ACTION

### Violations of Title IX

102. Plaintiff re-alleges and incorporates herein the allegations set forth in this Complaint.

103. 20 U.S.C.A. § 1681(a) ("Title IX") states that "[n]o person . . . shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance . . . ."

104. Responding unreasonably to a student's report of sexual harassment is discrimination on the basis of sex.

105. GWU is an educational institution receiving federal funds.

106. While enrolled at GWU, Ms. Prasad was severely and repeatedly subjected to extreme harassment based on her sex such that it created a hostile and abusive environment.

107. GWU had actual knowledge of the harassment, as Ms. Prasad reported the harassment to GWU through all channels made available to her, including to GWPD, the Coordinator of Victim Services, and OSRR.

108. GWU's response to Ms. Prasad's reports of harassment was unreasonable in the following ways:

(a) GWU never referred Ms. Prasad to its Title IX coordinator;

(b) GWU failed to communicate or follow a clear protocol for Ms. Prasad to report instances of sexual harassment;

(c) GWU portrayed GWPD as Ms. Prasad's sole resource for mitigating the harassment;

(d) GWU failed to follow its own stated procedures for handling complaints of sexual harassment as outlined in GWU's *Sexual Harassment and Sexual Violence Policy and Procedures*;

(e) GWU refused to allow Ms. Prasad to change her university email account to avoid future harassment;

(f) GWU failed to enforce its own No Contact Orders, rendering them useless;

(g) GWU gave Ms. Prasad inadequate notice of the impending disciplinary hearing against VT;

(h) GWU never informed Ms. Prasad in writing of the results of VT's hearing;

(i) GWU orally provided false information to Ms. Prasad which caused her to delay utilization of other remedies available to her;

(j) GWU awarded VT a degree after imposing disciplinary measures upon him explicitly forbidding the award of such a degree unless VT complied with the 2013 No Contact Order, therefore rendering those disciplinary measures meaningless.

109. GWU violated Title IX by discriminating against Ms. Prasad on the basis of sex.

110. GWU violated Title IX by denying Ms. Prasad the educational benefit of a safe and supportive learning environment.

111. Ms. Prasad is entitled to compensatory damages for pain and suffering, inconvenience and other non-pecuniary losses, and reasonable attorneys' fees.

**SECOND CAUSE OF ACTION**

**Breach of Third Party Beneficiary Contract**

112. Plaintiff re-alleges and incorporates herein the allegations set forth in this Complaint.

113. *Restatement (Second) of Contracts* § 302 (1) (b) states that:

> Unless otherwise agreed between promisor and promisee, a beneficiary of a promise is an intended beneficiary if recognition of a right to performance in the beneficiary is appropriate to effectuate the intention of the parties and the circumstances indicate that the promisee intends to give the beneficiary the benefit of the promised performance.

114. The District of Columbia has adopted the *Restatement (Second) of Contract*'s position on third-party beneficiary contracts.

115. Defendant GWU entered into a contract with VT including that VT was only entitled to graduate if he was to comply with the No Contact Order.

116. The contract was formed with the intention to prevent Ms. Prasad from experiencing any further sexual harassment exposure and to ensure a safe and secure educational environment for Ms. Prasad.

117. The above-mentioned condition was necessary to effectuate the intentions of the parties.

118. The fact that Ms. Prasad was an intended third-party beneficiary of the contract gives Ms. Prasad the right to enforce the contract and receive damages for breach. *Restatement*, supra, § 304.

119. GWU breached the contract by providing a degree to VT before he had completed the conditions of the contract–namely, before he had gone three years without contacting Ms. Prasad.

120. GWU's breach of contract irreparably and predictably harmed Ms. Prasad because its breach caused her to experience severe cyber harassment with countless threatening, sexual, and harassing emails; made her unable to maintain and achieve her academic

goals; caused severe sleep deprivation, anxiety, and night terrors, necessitating treatment with anti-depressants and prescription sleeping pills; and the harassment created severe enough distress and scarring that she was ultimately diagnosed with PTSD, and had to seek professional psychological help multiple times.

121. Because the purpose of the contract was to stop an ongoing process of harassment, stalking and violence, and to effectuate the goals of Title IX, severe emotional distress was a reasonably foreseeable consequence of GWU's breach.

122. As a consequence of GWU's breach, Ms. Prasad suffered damages as explained in this Complaint.

## THIRD CAUSE OF ACTION

### Promissory Estoppel

123. Plaintiff re-alleges and incorporates herein the allegations set forth in this Complaint.

124. Defendant GWU promised it would take actions against VT in order to protect Ms. Prasad.

125. The promise reasonably induced reliance by Ms. Prasad.

126. Ms. Prasad was an intended beneficiary of GWU's promises.

127. GWU did not implement the promised protections.

128. Ms. Prasad relied on GWU's promises to her detriment.

129. Injustice resulted from GWU's failure to implement the promised protections.

## FOURTH CAUSE OF ACTION

### Negligent Infliction of Emotional Distress

130. Plaintiff re-alleges and incorporates herein the allegations set forth in this Complaint.

131. Defendant GWU owed Ms. Prasad a duty to investigate and address sexual harassment and to act with reasonable care in furtherance of her wellbeing.

132. Defendant GWU had the authority, power, and ability to intervene to prevent or prohibit the sexual harassment described herein. Despite their duty and ability, GWU negligently failed to act to protect Ms. Prasad, thereby breaching its duty to her.

133. An actor whose negligent conduct causes serious emotional distress to another is subject to liability if the conduct:

(a) Causes Plaintiff to suffer physical impact or injury and the emotional disturbance results from the impact;

(b) Places Plaintiff in immediate danger of bodily harm, or in the "zone of physical danger," and, as a result, the Plaintiff feared for her own safety;

(c) Occurs in the course of specified categories of undertakings or relationships in which negligent conduct is especially likely to cause serious emotional disturbance.

134. GWU is subject to liability based on all three theories.

135. Ms. Prasad was physically impacted as a result of GWU's negligence. As a direct and proximate result of the harassing and unsafe educational environment created by Defendant's negligent response to the persistent sexual harassment, Ms. Prasad suffered, and continues to suffer, severe PTSD.

136. GWU's negligent conduct placed Ms. Prasad in the zone of immediate physical danger, causing her to fear for her own safety. As a direct and proximate result of the harassing and unsafe educational environment created by Defendant's negligent response to the persistent sexual harassment, Ms. Prasad became fearful for her life and safety which

required her to seek mental health counseling and medical treatment to cope with the stress of attending GWU and living with the constant threat of physical and emotional violence.

137. GWU had a special relationship with, or had undertaken a special obligation to Ms. Prasad of a nature that necessarily implicated Plaintiff's emotional wellbeing. GWU had undertaken a special obligation to Plaintiff arising from the relationship between a student and her educational institution. Universities are dedicated to furthering the wellbeing of their students and it is especially likely that a university's breach of its duty to protect its students from sexual harassment would result in serious emotional harm. As a direct and proximate result of the harassing and unsafe educational environment created by Defendant's negligent response to the persistent sexual harassment, Ms. Prasad was placed in immediate physical danger, causing her to fear for her own life and suffer severe emotional distress.

138. GWU's negligence in fact caused Ms. Prasad to suffer from serious and verifiable harm, including PTSD, mental anguish and emotional distress.

**FIFTH CAUSE OF ACTION**

**Negligent Retention**

139. Plaintiff re-alleges and incorporates herein the allegations set forth in this Complaint.

140. An employer breaches a duty to a plaintiff to use reasonable care in the retention of an employee which proximately caused harm to the plaintiff if that employer knew or should have known its employee behaved in a dangerous or otherwise incompetent manner and the employer failed to adequately supervise the employee.

141. Mr. Slifka is an employee of GWU.

142. Mr. Slifka proximately caused harm to Ms. Prasad by treating her with callous disregard and by failing to investigate and address sexual harassment.

143. Upon information and belief, Mr. Slifka had previously caused harm to other sexual harassment victims in a similar manner.

144. Upon information and belief, other sexual harassment victims have made GWU aware of the harm Mr. Slifka had inflicted upon them.

145. GWU failed to take adequate measures to ensure that Mr. Slifka followed written university procedures and ensure Mr. Slifka did not aggravate the harm suffered by sexual harassment victims.

146. GWU has negligently retained Mr. Slifka and therefore caused harm to Ms. Prasad.

## RELIEF REQUESTED

WHEREFORE, Ms. Prasad respectfully requests that this Court issue an order:

A. Declaring that Defendant unlawfully discriminated against Ms. Prasad on the basis of sex, in violation of Title IX, 20 U.S.C. § 1681(a);

B. Declaring that Defendant breached its contract, to which Ms. Prasad was a third party beneficiary.

C. Awarding Ms. Prasad compensatory damages for emotional pain and suffering, inconvenience, and other non-pecuniary losses caused by Defendant's actions;

D. Awarding punitive damages and equitable and legal remedies as appropriate to effectuate the purpose of 20 U.S.C. § 1681(a);

E. Awarding Ms. Prasad reasonable costs and attorneys' fees; and

F. Granting other such and further relief the court may deem just and proper.

**JURY DEMAND**

Plaintiff hereby demands a trial by jury for all claims presented.

*/s/ Daniel Hornal*______________________
Daniel Hornal (DC Bar # 1006894)
*/s/ Daniel Snow*______________________
Daniel Snow (DC Bar # 486293)
Talos Law
705 4th Street, NW
Washington, DC 20001
Phone: (202) 709-9662
Email: dansnow@taloslaw.com
daniel@taloslaw.com

*/s/ Meghan Boone*____________________
Meghan Boone (DC Bar # 1006894)
Michael Kirkpatrick (DC Bar # 486293)
Institute for Public Representation
Georgetown University Law Center
600 New Jersey Avenue, Suite 312
Washington, DC 20001
Phone: (202) 662-9535
Fax: (202) 662-9634
Email: mmb302@law.georgetown.edu
Michael.Kirkpatrick@law.georgetown.edu

*Attorneys for Plaintiff*

Dated: October 19, 2015