**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| **RICCA PRASAD** | ) |
|  | ) |
|  | ) No. 1:15-cv-1779 (ABJ) |
|  | ) |
| *Plaintiff*, | ) |
|  | ) |
| v. | ) |
|  | ) |
|  | ) |
| **THE GEORGE WASHINGTON** | ) |
| **UNIVERSITY** | ) |
|  | ) |
| *Defendant*. | ) |
|  | ) |

**PLAINTIFF'S OPPOSITION TO DEFENDANT'S PARTIAL MOTION TO
DISMISS**

Ms. Prasad was subject to discriminatory and illegal conduct at the hands of the

Defendant George Washington University (GW) when GW failed to meaningfully

respond to her numerous reports of sexual harassment by another student. In her

Complaint, Ms. Prasad has clearly and sufficiently pleaded claims for sex discrimination

under federal law, in addition to common law claims, arising from this treatment.

Extinguishing her common law claims at this stage of the litigation would be premature,

as she is entitled to proceed into discovery to develop a full factual record on which the

merits of her legal claims can be determined.

### I.      Statement of Facts

Ms. Ricca Prasad was a joint degree student at George Washington University

(GW) from September 2010 through May 2015. Compl. ¶ 8. During her freshman year

Ms. Prasad began dating VT, a fellow GW undergraduate student. Compl. ¶ 9. After he

1

became aggressive and threatening towards Ms. Prasad and others, Ms. Prasad ended their relationship in January 2012 and filed a report with the George Washington University Police Department (GWPD) documenting VT's harassing and threatening behavior. Compl. ¶¶ 10-14. GW did not allow Ms. Prasad to change her e-mail address, preventing her from effectively avoiding VT's continued harassment via e-mail. Compl. ¶¶ 14-18. In January 2012, Ms. Prasad informed staff members of the Office of Student Rights and Responsibilities (OSRR) of this continued harassment and provided them with copies of the threatening e-mails. Compl. ¶¶ 19-20.

On March 30, 2013, Ms. Prasad met with VT in a park near GW, in an attempt to convince him to end his harassment. Compl. ¶¶ 28-29. During this encounter VT physically assaulted Ms. Prasad. Compl. ¶¶ 30-32. She reported the assault to GWPD on April 1, 2013. Compl. ¶ 33. A No Contact Order was put in place and the matter was referred to Gabriel Slifka, director of OSRR. Compl. ¶¶ 33-35. A week after Ms. Prasad's report of the assault, Mr. Slifka contacted Ms. Prasad to schedule a meeting. Compl. ¶ 37. At the meeting, Ms. Prasad informed Mr. Slifka about VT's ongoing harassment, VT's history of substance abuse, and the fear she felt for her own safety. Compl. ¶ 38. Mr. Slifka stated that while GW policy was to suspend students involved in assaults, he would decline to do so in this case at least partially based on the previous romantic relationship between Ms. Prasad and VT. Compl. ¶¶ 41-42.

The No Contact Order entered by GW did not deter VT from stalking and harassing Ms. Prasad. Compl. ¶¶ 45-47. Ms. Prasad informed GW personnel of this harassment, including sending to Mr. Slifka approximately fifty disturbing e-mails VT had sent to her. Compl. ¶¶ 48-54. While GW finally held a disciplinary hearing for VT on

May 21, 2013, Ms. Prasad could not attend due to the short notice given to her by GW. Compl. ¶ 58. Despite repeated requests, Ms. Prasad never received written documentation regarding the outcome of that hearing. Compl. ¶¶ 60-62. After making multiple inquiries to OSRR, Mr. Slifka eventually informed Ms. Prasad that VT had been suspended for two years, during which time the No Contact Order would remain in place. Compl. ¶ 62. At no time did GW refer Ms. Prasad to Title IX resources. Compl. ¶¶ 21, 43, 52, 55, 81.

Despite Mr. Slifka's representations that GW had taken disciplinary action against VT, the harassment continued. Compl. ¶ 65. In July 2013, Ms. Prasad filed another report with GWPD, including over thirty pages of harassing e-mails that VT had sent her. Compl. ¶¶ 66-67.  OSRR did nothing to respond to this harassment, declining to bring further disciplinary charges against VT for his continual violation of the No Contact Order. Compl. ¶¶ 68-69.

Due to GW's refusal to effectively protect Ms. Prasad against VT, Ms. Prasad filed a petition for a civil protection order with the Superior Court of the District of Columbia. Compl. ¶ 71. After being granted a temporary civil protection order on September 30, 2013, VT's attorneys provided her with a copy of a contract that VT had signed with GW on November 4, 2013, stating that in order for VT to receive his degree from GW he must comply with the No Contact Order for a period of three years and he must not violate any other university policy. Compl. ¶¶ 74-75. In reliance on this contract being an effective deterrent to VT's harassment, Ms. Prasad dropped her request for a civil protection order. Compl. ¶ 76. Nevertheless, VT repeatedly violated the No Contact Order by continuously harassing Ms. Prasad by phone, e-mail, and various social media for the next fourteen months, despite Ms. Prasad's pleas for VT to stop. Compl. ¶¶ 77-79.

Ms. Prasad reported these violations to GWPD and to OSRR. Compl. ¶¶ 80, 93-94. Following multiple unheeded requests for GW's assistance, Ms. Prasad was eventually informed by GW that the agreement between GW and VT was no longer valid and that VT had been awarded his degree. Compl. ¶¶ 93-97.

On October 21, 2015, Ms. Prasad filed the instant case against GW, bringing statutory claims under Title IX, 20 U.S.C. § 1681(a), and common law claims for breach of contract, promissory estoppel, negligent infliction of emotional distress, and negligent retention. On December 3, 2015, GW, by and through counsel, moved to dismiss all counts except for the violations of Title IX.

## II.      Legal Standard Under Federal Rule of Civil Procedure 12(b)(6).

In considering a motion to dismiss based on Federal Rule of Civil Procedure 12(b)(6), a court must treat the Complaint's factual allegations as true and must grant a plaintiff "the benefit of all inferences that can be derived from the facts alleged." *See Sparrow v. United Air Lines, Inc.*, 216 F.3d 1111, 1113 (D.C. Cir. 2000) (quoting *Schuler v. United States,* 617 F.2d 605, 608 (D.C. Cir. 1979)). A motion to dismiss must be denied if a plaintiff's claims are "plausible on their face," meaning that the facts pled allow the court to draw the reasonable inference that Defendant is liable for the misconduct alleged. *Ashcroft v. Iqbal*, 556 U.S. 662, 667–68 (2009). When determining whether a complaint states a plausible claim, the court construes the complaint liberally in the plaintiff's favor, *see Kowal v. MCI Commcn's Corp.*, 16 F.3d 1271, 1276 (D.C. Cir. 1994), assuming at this early stage of the litigation that, "all the allegations in the complaint are true (even if doubtful in fact)." *Aktieselskabet AF 21.*

*November 2001 v. Fame Jeans Inc*., 525 F.3d 8, 17 (D.C. Cir. 2008) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).

### III.    Ms. Prasad States a Claim for Breach of a Third-Party Beneficiary Contract.

GW argues that Ms. Prasad cannot state a claim for breach of contract as a third-party beneficiary because GW did not breach the contract, but rather, VT did. For the court to accept GW's argument, it first would need to determine that GW is the promisee, not the promisor, and such a determination is inappropriate for a motion to dismiss, particularly where Ms. Prasad has alleged that GW is the promisor. Further, even if GW is the promisee, the rule in Restatement (Second) of Contracts § 311 (2), adopted in this jurisdiction by *Fields v. Tilerson*, 726 A.2d 670, 673 (D.C. 1999), states that the power of a contractual party to decline to enforce an agreement terminates when an intended third-party beneficiary materially changes her position in reliance on the contract.

### A. The determination of who is a promisee and promisor is inappropriate for a 12 (b) (6) motion.

GW argues that Ms. Prasad's third-party beneficiary claim lies against the promisor only and that GW was the promisee in its contract with VT. *See* Def.'s Br. at 4-5. GW's argument is inappropriate for a motion to dismiss because it requires the Court to make determinations about the merit of Ms. Prasad's claim rather than a determination about whether the claim is proper as pled. *See Swierkiewicz v. Sorema N. A.*, 534 U.S. 506, 515 (2002) (noting that the Federal Rules of Civil Procedure do not contemplate a judicial inquiry into the merits of a pleading at the motion to dismiss stage, but instead only into the sufficiency of the pleading). GW will have the opportunity to make its

assertions about which party to the contract was the promisee at the summary judgment stage.

That summary judgment is the appropriate place for these arguments is clear from the cases cited in GW's brief. *See John D. Neumann Props., Inc. v. Washington Metro. Area Transit Auth.*, No. CIV. A. 86-2013, 1988 WL 9582 (D.D.C. Jan. 29, 1988) (ruling on a motion for summary judgment); *Bituminous Coal Operators' Ass'n, Inc. v. Connors*, 867 F.2d 625 (D.C. Cir. 1989) (ruling on the promisor-promisee issue at the summary judgment stage); *cf. District of Columbia v. Campbell*, 580 A.2d 1295 (D.C. 1990) (overturning the lower court's directed verdict on the promisor-promisee issue.) Ms. Prasad has pled that "GW entered into a contract with VT including that VT was only entitled to graduate if he was to comply with the No Contact Order." Compl. ¶ 115. Construed, as it must be, in the light most favorable to Ms. Prasad, either party could be the promisor or promisee. Dismissal is therefore inappropriate.

### B.  GW is a "promisor" and breached its promise.

Even if the court were to delve into the promisor-promisee analysis at this early stage, dismissal would still not be proper because GW is indeed a promisor in the contract. Ms. Prasad has not pled that GW would grant the degree in exchange for VT's compliance with the No Contact Order, but rather that GW promised that it would not grant the degree unless VT complied with the No Contact Order. By electing not to comply with the No Contact Order, VT triggered the condition upon which GW had promised it would not award him a degree. *See* Compl. ¶ 75. As explained in the Complaint, "[t]he contract was formed with the intention to prevent Ms. Prasad from experiencing any further sexual harassment exposure and to ensure a safe and secure

educational environment for Ms. Prasad." Compl. ¶ 116. That GW is the promisor in a conditional contract is no bar to Ms. Prasad's claim because the condition upon which performance was due (VT's noncompliance with the No Contact Order) came to pass. *See Restatement (Second) of Contracts* § 303 (1981) ("[third-party beneficiary rights] are applicable to both conditional and unconditional promises . . . .").[1] For this same reason, GW's argument that it merely declined to enforce a contract right is mistaken. The language of the contract shows that the University bound itself to not grant VT a degree if VT disobeyed the No Contact Order. *See* Compl. ¶ 75.

### C.   GW had no power to decline to enforce the contract.

Even if GW was the promisee and not the promisor, Ms. Prasad can maintain her third-party beneficiary claim under the rule set out in the *Restatement (Second) of Contracts* § 311 (1981) and adopted in *Fields v. Tillerson*, 726 A.2d at 673: The promisor's and promisee's powers to discharge or modify duties terminate when the third-party beneficiary, before he receives notification of the discharge or modification, materially changes his position in justifiable reliance on the promise.

GW would not have been in a position to "decline to enforce" its contract because Ms. Prasad withdrew her petition for a civil protective order against VT in reliance on the sufficiency of the protection provided by the contract. *See* Compl. ¶ 76. Under the common law of the District of Columbia, a third-party beneficiary may sue for breach by

---

[1] In addition, the promisor-promisee distinction is not an absolute bar to suits by a third-party beneficiary against a promisee. For example, in "creditor beneficiary" contracts the beneficiary may maintain an action against the promisee where the beneficiary had a previous enforceable claim against the promisee and the promisor essentially assumed the promisee's obligation. *See Restatement (Second) of Contracts* § 310(1) (1981). Similarly, suits by trustees can be brought against two parties who have created a trust for the benefit of a third party and failed in their obligations. *See Piedmont Resolution, LLC v. Johnston, Rivlin, & Foley*, 999 F.Supp 34 (D.D.C. 1998).

a promisee where the beneficiary made a material change in position in justifiable reliance on the contract.

### IV.    Ms. Prasad States a Claim for Promissory Estoppel.

As her third cause of action, Ms. Prasad alleges under a theory of promissory estoppel that she reasonably relied, to her detriment, on GW's promise that it would take specific actions against VT if he continued to harass her. GW challenges Ms. Prasad's promissory estoppel claim on two grounds: that the Complaint does not allege the existence of an "estopping promise" of sufficient specificity and that the Complaint does not allege detrimental reliance on that promise. Read in its entirety, as it must be, the Complaint alleges both of these elements, and is thus sufficient to survive GW's motion to dismiss this claim.

GW excerpts one paragraph of the Complaint (¶ 124) and claims that, because that paragraph alone does not allege a sufficiently definite promise, the Complaint as a whole fails to allege such a promise. *See* Def.'s Br. at 6–7. Belying GW's assertion, however, are numerous other paragraphs in the Complaint which provide exactly the details GW claims Ms. Prasad did not plead. *See* Compl. ¶¶ 74–79, 95, 97, 98, 108(j), 115–117; *see also Vila v. Inter-American Inv., Corp.*, 570 F.3d 274, 285 (D.C. Cir. 2009) (reasoning that, when determining whether a complaint states a claim, the allegations in the complaint should be "[v]iewed in their totality.").

The Complaint states that GW agreed that it would not award VT a degree if he failed to comply with the No Contact Order for three years from the date of the agreement. Compl. ¶¶ 75, 115, 116. This agreement constitutes a promise to Ms. Prasad that GW would provide this specific deterrence to further harassment from VT. Thus, the

8

allegations in the Complaint, detailing a promise not to perform a particular action before a precise condition is met, constitute a promise specific enough to sustain a promissory estoppel claim. *See, e.g.*, *Myers v. Alutiiq Int'l. Solutions, LLC*, 811 F. Supp. 2d 261, 272–73 (D.D.C. 2011) (finding defendant's statement that the plaintiff "would have to be crazy" to think defendant would perform an action to be sufficiently specific enough to reasonably induce reliance for the purposes of a promissory estoppel claim) (citing *Mahony v. Universal Pediatric Servs., Inc.*, 753 F. Supp. 2d 839, 855–56 (S.D. Iowa 2010) (holding a defendant's statement that it would "not permit any supervisor . . . to engage in any form of retaliation against any employee" to be "a clear promise" and specific)). Indeed, as stated in a case GW cites in its motion, Def.'s Br. at 6, "a promise need not be as specific and definite as a contract." *In re Office Prods. Co. Sec. Litig.*, 251 F. Supp. 2d 77, 97 (D.D.C. 2003). Even though a promise "need not be as specific and definite as a contract," Ms. Prasad alleges the existence of just such a contractual promise here. *See* Compl. ¶¶ 74-76.

The specificity of this promise is further emphasized when compared to the other cases cited by GW. In *Simard v. Resolution Trust Corp.*, 639 A.2d 540 (D.C. 1994), the court found the defendant had made no specific promise to keep the plaintiff employed for a fixed period of time because such a statement was expressly contradicted by the language of the agreement signed by both parties. *See id.* at 551, 552–53 (quoting from the signed agreement that the employee "understand[s] and agree[s] that [her] employment is for no definite period . . . ."). Unlike in *Simard*, Ms. Prasad identifies a promise explicitly stipulated in GW's written agreement. Compl. at ¶ 75.

GW also cites *Choate v. TRW, Inc.*, 14 F.3d 74 (D.C. Cir. 1994). *See* Def.'s Br. at 7. In that case, the court determined the statement of the defendant's CEO that "[t]he topic [of plaintiff's book] sounds wonderful, and I have no problems with it," did not constitute a specific promise because it was not "an expression of intention that the promisor will conduct himself in a specified way or bring about a specified result in the future . . . ." *Choate*, 14 F.3d at 77–78. Unlike the statement at issue in *Choate*, GW's agreement states that it will not take a specific action — awarding VT a degree — absent a specific condition – VT's compliance with the No Contact Order for a period of three years. Compl. at ¶ 75. This agreement is an expression of intention to refrain from performing one particular action, whereas the agreement in *Choate* provides no such specific intention. *See Choate*, 14 F.3d at 77–78. For these reasons, the instant case is distinguishable from *Simard* and *Choate*.

GW also challenges Plaintiff's claim on the grounds that it does not demonstrate Ms. Prasad's detrimental reliance on GW's promise. Def.'s Br. at 7. The Complaint alleges, however, that Ms. Prasad chose to drop her petition for a Civil Protection Order against VT because she believed the promises made by GW in its agreement with VT "would sufficiently deter VT from continued violation of the No Contact Order." Compl. at ¶ 76. This shows that GW's promise caused Ms. Prasad to abjure alternative protection in the form of a Civil Protection Order. As alleged in the Complaint, if GW's promise had not induced Ms. Prasad to drop her petition for a Civil Protection Order against VT, that Civil Protection Order likely would have prevented VT's harassment. *See, e.g.,* Compl. ¶ 101. By not providing the deterrence promised, GW caused Ms. Prasad to suffer the harms detailed in the Complaint. *See, e.g.,* Compl. ¶ 120.

As Ms. Prasad has pled both a specific promise and detrimental reliance, GW's motion should be denied.

**V.      Ms. Prasad States a Claim for Negligent Infliction of Emotional Distress.**

As her fourth cause of action, Ms. Prasad alleges that GW's negligent conduct caused her serious emotional distress. A Plaintiff can prevail on a claim for Negligent Infliction of Emotional Distress (NIED) in the District of Columbia under at least three different theories. First, a plaintiff may recover if she suffered serious and verifiable injury resulting from a defendant's negligence. *See, e.g.*, *Williams v. Baker*, 572 A.2d 1062 (D.C. 1990). Second, the "zone of danger" rule allows a plaintiff to recover, even without accompanying physical injury, if a defendant's conduct caused her to be in a zone of danger and to fear for her own safety. *See, e.g.*, *Hedgepeth v. Whitman Walker Clinic*, 22 A.3d 789, 796-97 (D.C. 2011). Third, the special undertaking doctrine allows a plaintiff to recover when a defendant's negligence occurs in the course of a special undertaking or relationship in which negligent conduct is especially likely to cause serious emotional disturbance. *See, e.g.*, *id.* The court should deny GW's motion to dismiss Ms. Prasad's NIED claim because she has alleged facts sufficient to prevail under all three theories of liability.

**A.  Allegations of physical injury or impact are not required to assert a claim for negligent infliction of emotional distress.**

GW contends that Ms. Prasad failed to allege "the kind of physical injury necessary to sustain an NIED claim" because she failed to allege a "direct physical injury." Def.'s Br. at 8-10. Contrary to GW's assertion, however, Ms. Prasad is not required to allege direct physical injury, as this Court has rejected the traditional physical

11

impact requirement in favor of a test which requires only that the claimed distress be "serious" and "verifiable." *Williams v. Baker*, 572 A.2d 1062, 1068 (D.C. 1990) (quoting *Bovson v. Sanperi*, 461 N.E.2d 843, 849 (N.Y. 1984)). The court in *Williams* found that the requirement of showing physical impact, which had previously been used as a mechanism to safeguard against fraudulent claims, was no longer necessary, as advances in medicine and science had enabled courts to adopt a more expansive view of the injury required to sustain an NIED claim. *Id.* at 1067 (noting that "due to advances in medical research and improved diagnostic techniques, the presence of emotions such as grief, anxiety, and anger is frequently accompanied by physical indicia that are capable of objective proof" (citing Prosser & Keeton, *On The Law Of Torts* 361 (5th ed. 1984)). One year after *Williams*, the rule that the tort of negligent infliction of emotional distress does not require that the plaintiff suffer physical injury was confirmed. *Jones v. Howard Univ., Inc.*, 589 A.2d 419, 424 (D.C. 1991). GW incorrectly cites *Hedgepeth*, 22 A.3d at 797, for the opposite proposition. Def.'s Br. at 8. As *Hedgepeth* makes clear, a plaintiff need only allege that she suffered a serious and verifiable injury, not necessarily a physical one, in order to recover for the mental distress she has suffered. 22 A.3d at 797 ("[T]he plaintiff no longer need[s] to show that her emotional distress was the result of a 'physical impact.'").

The Complaint alleges that Ms. Prasad was diagnosed with Post-Traumatic Stress Disorder (PTSD) in February 2014. *See* Compl. ¶ 83. PTSD is a mental disorder that is both serious and verifiable. *See Destefano v. Children's Nat'l. Med. Ctr.*, 121 A.3d 59, 72–73 (D.C. 2015) (upholding a jury award of $26,000 for NIED where the plaintiff suffered from PTSD); *see also Daigle v. Phillips Petroleum Co.,* 893 S.W.2d 121, 122–

12

23 (Tex. App. 1995) (holding plaintiff who suffered post-traumatic stress disorder, but no physical injury, could recover). PTSD has caused Ms. Prasad to suffer from an array of serious conditions such as severe sleep deprivation, anxiety, and night terrors, necessitating treatment with anti-depressants and prescription sleeping pills. *See* Compl. ¶ 84. Further, her illness is verifiable, as she was formally diagnosed by a treating medical provider. *See* Compl. ¶ 83. Ms. Prasad has adequately alleged that she suffered severe and verifiable injury as the result of Defendant's negligence, and thus her claim for negligent infliction of emotional distress should not be dismissed for lack of a physical impact.

**B.  GW's actions placed Ms. Prasad in the zone of physical danger.**

Ms. Prasad may also recover for NIED under the "zone of physical danger" doctrine. The zone of danger rule allows plaintiffs to recover damages for emotional distress in circumstances where there is no physical injury in recognition that "a near miss may be as frightening as a direct hit." *Hedgepeth*, 22 A.3d at 811 (quoting *Williams*, 572 A.2d at 1067). To recover under the zone of danger doctrine, a plaintiff must be in a zone of danger that is caused by the defendant's conduct, and she must fear for her own safety as a result. *Williams*, 572 A.2d at 1067.

GW makes two arguments with respect to whether Ms. Prasad was placed in a zone of physical danger as a result of GW's conduct. First, GW claims that Ms. Prasad merely faced a "remote possibility of personal peril as a result of the University's conduct" and alleges that such circumstances are insufficient to place her in a zone of physical danger. Def.'s Br. at 8. Second, Defendant argues that Ms. Prasad's NIED claim should be dismissed because her presence in the zone of danger was not

contemporaneous with her fear for her own safety. *Id.* at 10. Both arguments should be rejected.

> 1.   As a result of GW's negligence, Ms. Prasad was in danger of immediate harm and subjected to a long-term state of peril, causing her to fear for her safety.

GW asserts that Ms. Prasad failed to allege any physically threatening incident that placed her in imminent fear for her safety. In order to make that argument, however, GW ignores the allegations in the Complaint that Ms. Prasad feared for her physical safety and that her fear was a result of GW's negligence.

As an initial matter, many of the cases GW cites in its motion apply a standard inappropriate for the stage of this litigation. GW relies on *Ryczek v. Guest Services, Inc.*, 877 F. Supp. 754 (D.D.C. 1995), to argue that a plaintiff must present evidence that she was imminently endangered and that the threatened injury was not minimal. *See* Def.'s Br. at 11. However, the court disposed of that case at the summary judgment stage, after the plaintiff had an opportunity to engage in discovery and develop the factual record. *Ryczek,* 877 F. Supp. at 764. GW also cites to *McMillan v. National Railroad Passenger Corp.,* 648 A.2d 428 (D.C. 1994), to support its contention that the Complaint lacks evidence of the kinds of physical risk necessary for an NIED claim. *See* Def.'s Br. at 10, 11. The court in *McMillan*, however, concluded that the plaintiff had failed to establish a prima facie case for NIED after considering "evidence produced at trial." *McMillan*, 648 A.2d at 435. At the motion to dismiss stage, Ms. Prasad is not subject to these heightened standards of review because she has not had the opportunity to fully develop the factual record. *See Badwal v. Bd. of Trs. of Univ. of D.C.,* No. 12-CV-2073 (KBJ), 2015 WL 5692842, at *12 n.17 (D.D.C. Sept. 28, 2015) (finding summary judgment cases cited by defendant in motion to dismiss inapposite, as claims for summary judgment were

generally decided with a more developed factual record and under a stricter standard than the plausibility analysis applicable at a motion to dismiss).

Under the correct standard, Ms. Prasad has adequately met her burden of alleging sufficient factual matter to state a plausible claim that she feared for her safety as a result of GW's negligence. Far from the "remote" possibility of physical peril that GW claims Ms. Prasad experienced, the Complaint clearly alleges that she suffered persistent harassment, violent threats, and stalking at the hands of VT, *see, e.g.,* Compl. ¶¶ 10, 12, 46-47, and that GW's actions in the face of this harassment caused Ms. Prasad to reasonably fear for her safety. *See, e.g.,* Compl. ¶¶ 56, 85. Indeed, Ms. Prasad endured threats significantly more severe than the workplace harassment experienced by the plaintiffs in the cases that GW cites. *See* Def.'s Br. at 11.

VT was a GW student with a history of physically assaulting, sexually harassing, and verbally threatening Ms. Prasad over the course of several years. *See* Compl. ¶¶ 10, 12, 18, 26, 27, 30–32, 45–47, 65, 67, 77, 78, 91, 92. Though the Defendant issued No Contact Orders, VT repeatedly violated them without consequence, even standing outside Ms. Prasad's first floor dormitory bedroom window. *See* Comp ¶ 46. Despite these facts, which are clearly alleged in the Complaint, GW characterizes Ms. Prasad's fear of physical danger as "speculative or remote." Def. Br. at 11.

GW's actions in the face of this continued harassment subjected Ms. Prasad to a reasonable fear for her physical safety. GW denied Ms. Prasad's request to change her e-mail address to evade VT's threatening e-mails. *See* Compl. ¶¶ 16-18. GW consistently failed to refer Ms. Prasad to Title IX resources. *See* Compl. ¶¶ 16, 36, 43. GW waited until May 2013 to conduct a disciplinary hearing, almost a year and a half after VT's

violent behavior began. *See* Compl. ¶ 57. VT's harassment continued following the hearing, prompting no further action by GW. *See* Compl. ¶¶ 65-69. Thus, the Complaint plausibly alleges that Ms. Prasad feared for her physical safety over a period of years as the result of GW's failure to take appropriate action to protect her.

2.   <u>Ms. Prasad's presence in the zone of danger was contemporaneous with her fear for her own safety.</u>

GW cites to *Jones v. Howard University*, 589 A.2d 419, 423 (D.C. 1991), a case decided at the summary judgment stage, for the proposition that a plaintiff's presence in the zone of danger must be contemporaneous with her fear for her own safety. Def.'s Br. at 10. Putting aside GW's invocation of the incorrect standard of review, the court in *Jones* held that summary judgment was inappropriate because the plaintiff in that case may have been able to recover under the zone of danger rule even though the distress she experienced continued for an extended period. *See Jones*, 589 A.2d at 420-21.

*Jones* involved a woman who presented at a hospital with stomach pain, unaware that she was pregnant. *Id*. After undergoing diagnostic x-rays and surgery, she later sued to recover for the mental distress she suffered when she realized she was pregnant and the doctors had negligently subjected her and her unborn twins to dangerous treatment. *Id.* The court held that her presence in the zone of danger was contemporaneous with her fear for her own safety if she could establish that the x-rays did in fact pose a threat to the unborn twins. *Id*. at 423. The court reasoned that, even though she was unaware of her pregnancy at the time she underwent the x-rays, the threat that radiation could harm the unborn twins continued through the entire pregnancy. *Id*. Therefore, the court concluded that "if the negligence results in a long continued peril, the illness may be caused by the

16

cumulative effects of the anxiety and suspense caused by the other's constant subjection to it." *Id.* (quoting Restatement (Second) of Torts § 436 cmt. c).

GW's negligence subjected Ms. Prasad to constant anxiety and suspense over a period of several years. Ms. Prasad was placed in a zone of danger for the duration of that time, subjecting her to a long-term state of peril and constant fear for her safety. Pursuant to the reasoning in *Jones*, Ms. Prasad meets the contemporaneous requirement both because she was in fear of immediate harm and because GW placed her in a condition of long continued peril.

**C. Ms. Prasad sufficiently alleged a claim for NIED under a special undertaking theory.**

A plaintiff may recover for NIED pursuant to the "special undertaking" doctrine even if defendant's actions did not cause plaintiff to be in actual danger of physical injury or place plaintiff in the zone of danger. To prevail under a special undertaking theory a plaintiff must show that (1) the defendant had a relationship with plaintiff, or had undertaken an obligation to plaintiff, of a nature that necessarily implicated plaintiff's emotional well-being; (2) there was an especially likely risk that defendant's negligence would cause serious emotional distress to plaintiff; and (3) negligent actions or omissions of defendant in breach of that obligation in fact caused serious emotional distress to plaintiff. *Hedgepeth*, 22 A.3d at 810–11. GW asserts only that Ms. Prasad's relationship with GW does not fall within the "narrow category" of special relationships contemplated by *Hedgepeth*. Def.'s Br. at 12. Although GW is correct that not every relationship or undertaking will suffice to create a duty to avoid the negligent infliction of emotional distress, it severely understates the scope and purpose of the special undertaking rule adopted in *Hedgepeth*. This rule was adopted to recognize the principle that "[w]hen

17

defendants have undertaken care for the plaintiff that includes care for emotional well-being, a ground comes into play that is far different from the ground upon which stranger liability is based." *Hedgepeth*, 22 A.3d at 804 (quoting Dan B. Dobbs, *Undertakings and Special Relationships in Claims for Negligent Infliction of Emotional Distress*, 50 Ariz. L. Rev. 49, 54 (2008)).

The court in *Hedgepeth* declined to limit the categories of relationships that give rise to a duty to avoid causing emotional distress. *Id* at 812, 815. It reasoned that "to propose such a listing at this time could pre-empt claims that are not before us, a limitation in the scope of judicial pronouncements that we have expressly rejected" and emphasized "that this is not intended to be an exclusive catalog of relationships or undertakings that may sustain viable claims[,] . . . nor is it meant to categorically exclude certain types of relationships or undertakings." *Id*. The court suggested weighing several factors, such as "the statutory, professional and ethical standards applicable to the defendant's activities establishing the responsibilities the defendant can be said to have accepted and to which it should be held accountable." *Id*. at 814–15.

GW's relationship with Ms. Prasad, and its special undertaking with regard to her well-being, existed on several levels. On the most basic level, Ms. Prasad was a college student who entrusted GW with her physical and emotional safety. *See* Compl. ¶ 8. GW was the source of her education, her housing, and her physical safety. The university controlled her living circumstances as well as her access to technology and campus security. *See* Compl. ¶¶ 16, 40. As a result, it was in a "position of power or authority over [her] and therefore [had] greater potential to inflict emotional harm." *See Hedgepeth*, 22 A.3d at 814 (quoting Restatement (Third) of Torts § 46 cmt. d).

18

On a more specific level, GW had a special obligation to Ms. Prasad after she had undertaken steps to pursue protection from OSRR, GWPD, and other GW offices. *See* Compl. ¶¶ 13, 15, 33, 48, 53, 54, 61, 62, 66, 80, 93. At that point, GW expressly undertook to care for the emotional and physical well-being of a vulnerable student who was experiencing sexual harassment at the hands of another GW student. Ms. Prasad has alleged sufficient facts to demonstrate her reliance on GW offices, employees, and university police for her well-being, and that GW had undertaken a special responsibility to her as a vulnerable student.

The cases cited by GW for the proposition that a university-student relationship is necessarily exempted from the "special undertaking" doctrine are not applicable here. Beyond the fact that *Doe v. Virginia Wesleyan College*, No. CL146942, 2015 WL 3867976 (Va. Cir. Ct. June 20, 2015), was decided under Virginia state law and *Bradshaw v. Rawlings*, 612 F.2d 135 (3d Cir. 1979), was decided under Pennsylvania law over thirty-five years ago, both cases deal with a university's duty to control the unforeseeable actions of non-employee third-parties. *Doe,* 2015 WL 3867976, at *4-8; *Bradshaw,* 612 F.2d at 141-43.[2] A patently different circumstance is presented here, as Mr. Prasad claims that GW undertook a special obligation to Ms. Prasad vis-à-vis its own employees' conduct and its response to the ongoing actions of another student on campus.

---

[2] Further, the court in *Doe* recognized that the specific facts of a case may give rise to a special relationship, even absent an enumerated special relationship under state law. *Doe*, 2015 WL 3867976, at *10-11.

## VI.   Ms. Prasad Has Adequately Alleged that GW Negligently Retained Mr. Slifka.

As her Fifth Cause of Action, Ms. Prasad alleges that GW negligently retained Mr. Slifka as the Director of OSRR, and that Mr. Slifka caused harm to Ms. Prasad. To state a claim for negligent retention, a plaintiff must allege that "the employer breached a duty to plaintiff to use reasonable care in the supervision or retention of an employee which proximately caused harm to plaintiff." *Pietsch v. McKissack & McKissack*, 677 F. Supp. 2d 325, 329 (D.D.C. 2010) (quoting *Phelan v. City of Mount Rainier*, 805 A.2d 930, 940 (D.C. 2002)). This theory of liability centers on the fact that "an employer knew or should have known that its employee behaved in a dangerous or otherwise incompetent manner, and that employer, armed with that actual or constructive knowledge, failed to adequately supervise that employee." *Brown v. Argenbright Sec., Inc.*, 782 A.2d 752, 760 (D.C. 2001) (quoting *Giles v. Shell Oil Corp.*, 487 A.2d 610, 613 (D.C. 1985)).

GW puts forth three bases for moving to dismiss this claim. First, GW asserts that Ms. Prasad does not allege facts sufficient to make her claim for negligent retention plausible. *See* Def.'s Br. at 14. Next, GW argues that Ms. Prasad fails to establish that GW knew or should have known that Mr. Slifka was behaving in a dangerous or incompetent manner. *See* Def.'s Br. at 15. Finally, GW argues that a claim of negligent retention must be predicated on a common law cause of action and that Ms. Prasad has based this claim on her statutory Title IX claim. *See* Def.'s Br. at 16. All three of these arguments fail.

20

### A. Ms. Prasad has alleged a credible claim for relief and dismissal would be inappropriate at this stage of the litigation.

When determining whether a complaint states a plausible claim for relief, the court construes the complaint liberally in the plaintiffs' favor. *See Kowal v. MCI Commcn's Corp.*, 16 F.3d 1271, 1276 (D.C. Cir. 1994). At this stage, a court must treat the complaint's factual allegations as true and must grant the plaintiff "the benefit of all inferences that can be derived from the facts alleged." *Sparrow v. United Air Lines, Inc.*, 216 F.3d 1111, 1113 (D.C. Cir. 2000) (quoting *Schuler v. United States*, 617 F.2d 605, 608 (D.C. Cir. 1979)). A claim is facially plausible when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct. *See Iqbal*, 556 U.S. at 678. Ms. Prasad's negligent retention claim reasonably allows the Court to conclude that GW was negligent in its retention of Mr. Slifka, and thus her claim should not be dismissed.

Defendant cites to *Chandamuri v. Georgetown University,* 274 F. Supp. 2d 71 (D.D.C. 2008), for support that "Ms. Prasad's conclusory allegations are . . . insufficient to state a claim." Def.'s Br. at 14. However, the *Chandamuri* court was presented with a plaintiff who made not just conclusory, but contradictory, factual allegations in his complaint — namely that the defendant in that case both had and had not exercised a particular discretionary measure. *Chandamuri,* 274 F. Supp. 2d at 79. Ms. Prasad's Complaint does not contain contradictory allegations, and it clearly alleges many specific instances when Mr. Slifka's actions constitute incompetent, if not dangerous, behavior. In April 2013, Mr. Slifka incorrectly represented that OSRR would not take action unless Ms. Prasad divulged VT's name. Compl. ¶ 36. Later that month, Mr. Slifka portrayed GWPD as Ms. Prasad's sole resource for addressing the situation, failing to direct her to

other support such as Title IX counselors or other university offices. *See* Compl. ¶¶ 40, 43. During that same meeting, Mr. Slifka indicated that Ms. Prasad's dating history with VT constituted a potential reason for deviating from GW's ordinary suspension policy. *See* Compl. ¶ 42. Despite the fact that Ms. Prasad informed Mr. Slifka of VT's history with substance abuse, the ongoing threats VT made against her, and the fear she felt for her safety, Mr. Slifka did not take actions to suspend VT. *See* Compl. ¶¶ 38, 42.

Ms. Prasad has additionally alleged that other GW students have previously submitted grievances against Mr. Slifka regarding similarly inappropriate responses to reports of sexual harassment. Compl. ¶ 44. She has pointed to several other occasions when Mr. Slifka failed to respond to Ms. Prasad's time-sensitive requests for help and information. *See* Compl. ¶¶ 37, 49, 55, 60-62, 94. These specific factual allegations are far from generic characterizations.

Finally, Defendant claims that "nowhere does [Ms. Prasad] identify what procedures Mr. Slifka was supposed to have followed with regard to her, or explain how his alleged failure to do so harmed her." Def.'s Br. at 14. Ms. Prasad identifies GW's procedures on two separate occasions in her Complaint. First, she refers to a statement Mr. Slifka made to her representing GW's typical procedure of responding to student assault with a three-year suspension. *See* Compl. ¶ 41. In her Complaint, she additionally cites to GW's Sexual Harassment and Sexual Violence Policy and Procedures, which mandate that "both parties will receive concurrent written notice of the outcome" of a disciplinary hearing regarding allegations of sexual harassment. *See* Compl. ¶ 99. Contrary to these policies, Ms. Prasad alleges that she never received written notice of the outcome of VT's disciplinary hearing and that Mr. Slifka was non-responsive to her

phone calls requesting information about the outcome. *See* Compl. ¶¶ 60–62. The Court can reasonably infer defendant's misconduct from these facts, thus making Ms. Prasad's claim plausible on its face.

### B. Ms. Prasad has adequately alleged that GW knew or should have known about Mr. Slifka's dangerous and incompetent performance.

Next, GW argues that the Complaint does not sufficiently allege that an employer "knew or should have known that an employee was acting in a 'dangerous or incompetent' manner." Def.'s Br. at 15 (quoting *Giles*¸487 A.2d at 613). Contrary to GW's assertion, however, the Complaint alleges facts that support the assertion that GW knew or should have known that Mr. Slifka's handling of Ms. Prasad's claims was incompetent, Compl. ¶¶ 55, 61-62, 66, 80, 85, 93-94, as well as allegations concerning GW's knowledge of Mr. Slifka's incompetence through other student complaints. Compl. ¶¶ 44, 144.

GW attempts to support its motion to dismiss by citing *Alqahtani v. George Washington*, No. CIV. 95-803 TFH, 1996 WL 568843 (D.D.C. Mar. 29, 1996), a case involving a claim for racial discrimination in the admissions process. *Id* at *2. The plaintiff in *Alqahtani* claimed that a university employee conditioned his admission to the university on payment of $10,000 or performance of sexual acts with a male admissions officer. *Id.* at *1. Unlike Ms. Prasad's Complaint, the plaintiff in that case did "not allege[] *any* facts from which to conclude the University knew or should have known of [the employee's] alleged behavior." *Id.* at *4 (emphasis added).[3] In contrast, Ms. Prasad

---

[3] Defendant also cites *Phelan v. City of Mount Rainier*, 805 A.2d 930 (D.C. 2002), but that case was decided under Maryland law, at the summary judgment stage, and involved an employee who was off-duty at the time the allegedly unlawful actions were taken. *Id.* at 933-35. Thus, *Phelan* is inapposite.

alleges that GW knew or should have known that Mr. Slifka engaged in incompetent and dangerous behavior because she reported the threatening and harassing e-mails of VT to other administrators and employees of GW. Compl. ¶¶ 50, 66, 80, 93-96. Therefore, GW should have known that Mr. Slifka was not adequately addressing VT's harassment and stalking even after a disciplinary hearing had occurred. In addition, Ms. Prasad alleges that GW knew or should have known that Mr. Slifka had previously behaved in a dangerous or incompetent manner because other students at GW had submitted grievances against him. Compl. ¶¶ 44, 144. These allegations are neither vague nor speculative, but are specific enough to entitle Ms. Prasad to continue into discovery. This is particularly true where, as is the case here, the student complaints and other documents which would lend factual support for Ms. Prasad's claims are entirely in the control of GW. At the very least, it is a question of fact whether these reports were sufficient to put GW on notice of Mr. Slifka's incompetent behavior and whether GW's investigations, if any, of Mr. Slifka's behavior were adequate. *See Beyene v. Hilton Hotels Corp.*, 815 F. Supp. 2d 235, 252-253 (D.D.C. 2011).

### C.  Ms. Prasad has appropriately predicated her negligent retention claim on both common law and statutory bases.

Next, Defendant argues that a negligent retention claim must be predicated on common law causes of action or duties otherwise imposed on the employer by the common law. *See* Def.'s Br. at 16. In support of this assertion, Defendant cites to a footnote in *Beyene*, 815 F. Supp. 2d at 252 n.21, but neglects to include the entirety of the quotation. Def.'s Br. at 16. While the court does state that a breach of a statutory duty alone does not form the basis for a negligent retention or supervision claim, the court went on to explain that, "[i]f, however, an employee's conduct forms the basis for a

24

statutory claim and is also actionable at common law, the plaintiff may bring both a statutory claim and a negligent supervision claim" *Beyene*, 815 F. Supp. 2d at 252 n.21. The *Beyene* court then denied the defendant's motion for summary judgment on the negligent retention claim, concluding that the plaintiff presented sufficient evidence to create a genuine dispute as to whether the defendant should have known about its employees' dangerous behavior. *See id.* at 253.

GW makes the same mistake chastised by the court in *Beyene. See id.* at 252 n.21; Def.'s Br. at 16. The fact that defendant has breached a duty created by statute does not prevent a negligent retention claim if the defendant's conduct also constitutes a breach of duties found in common law. *Beyene,* 815 F. Supp. 2d at 252 n.21. Ms. Prasad's negligent retention claim is appropriately predicated on the common law tort of Negligent Infliction of Emotional Distress. *See* Compl. ¶¶ 130–138;  *Pietsch*, 677 F. Supp. 2d at 329 (denying a motion to dismiss on a claim predicated on Intentional Infliction of Emotional Distress after an employer did not appropriately address plaintiff's claims that she was being sexually harassed by a coworker).

In fact, Ms. Prassad need not even rely on her NIED claim as a common-law predicate for the negligent retention claim. *Beyene,* as well as *Griffin v. Acacia Life Ins., Co.*, 925 A. 2d 564 (D.C. 2007) stand for the position that a negligent retention claim may be based on the breach of a common law *duty*, rather than just a common law tort committed by the employee in question. In *Griffin*, the court discusses the common-law duties placed upon an employer including "the duty to provide a safe place to work" and "the duty to promulgate and enforce rules for the conduct of employees which would make the work safe." *Griffin,* 925 A.2d at 576. (quoting Prosser & Keeton on Torts § 80,

25

at 569 (5th ed.1984) (footnotes omitted)). The court then notes that the breach of these duties by an employer may give rise to a negligent retention claim.

While *Griffin* discusses the common law duties owed to employees, the Court of Appeals has specifically held that a school has a duty to guard their students against "foreseeable harm". *See Thomas v. City Lights Sch., Inc.*, 124 F. Supp. 2d 707, 710 (D.D.C. 2000) (applying the rule and citing cases). So, by applying to the case at bar *Griffin's* holding that a negligent retention claim may be predicated on any common-law duty, and *Thomas*'s holding that a school has a duty to protect its students [4] (and generally, that all persons have a negligence duty to avoid actions and omissions that will foreseeably cause harm), it becomes clear that Ms. Prasad has plead sufficient factual material to clear the low bar of a 12(b)(6) motion.

As Ms. Prasad's Complaint alleges the breach of both common law and statutory duties, her claim for negligent retention should not be dismissed.

### VII.   Conclusion

Ms. Prasad has sufficiently pleaded her common law claims and is entitled to advance beyond this early stage in the litigation. Defendant's motion to dismiss should be denied.

Respectfully submitted,

December 17, 2015

/s/ Daniel Hornal_____
Daniel Hornal (DC Bar # 1006894)

---

[4] The full time student at a modern university is often beholden to their university for their housing, meals, and earning potential. As they are under the control of their University for at least as much time as a typical employee is under the control of his employer, it would only be logical that a university would owe the same duties to its students to provide a safe place to work/learn and to enforce rules pertaining to the conduct of fellow students which are promulgated to make a safe place to work/learn.

Talos Law
705 4th Street, NW
Washington, DC 20001
Phone: (202) 709-9662
Email: dansnow@taloslaw.com
daniel@taloslaw.com

*/s/ Meghan Boone*_____
Meghan Boone (DC Bar # 1006894)

/s/ Michael Kitkpatrick_____
Michael Kirkpatrick (DC Bar # 486293)

Institute for Public Representation
Georgetown University Law Center
600 New Jersey Avenue, Suite 312
Washington, DC 20001
Phone: (202) 662-9535
Fax: (202) 662-9634
Email: mmb302@law.georgetown
Michael.Kirkpatrick@law.georgetown.edu

## CERTIFICATE OF SERVICE

I hereby certify that on this 17th day of December 2015, a copy of Plaintiff's Memorandum of Points and Authorities in Support of Plaintiff's Opposition to Defendant's Partial Motion to Dismiss was served via the Court's electronic filing system on:

William D. Nussbaum
wnussbaum@saul.com
Saul Ewing LLP
1919 Pennsylvania Ave., NW, Suite 550
Washington, DC 20006

*Counsel for Defendant The George Washington University*


/s/ Daniel Hornal_____
Daniel Hornal