# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| RICCA PRASAD, | ) | |
| | ) | |
| Plaintiff, | ) | **PUBLIC WITH REDACTIONS** |
| | ) | |
| v. | ) | Civil Action No. 15-1779 (ABJ) |
| | ) | |
| THE GEORGE WASHINGTON | ) | |
| UNIVERSITY, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

The case arises out of the unhealthy and abusive relationship between plaintiff Ricca Prasad and "VT," who met when both were undergraduate students at George Washington University ("the University" or "GW").[1] Plaintiff has sued the University under Title IX, 20 U.S.C. § 1681(a), for how it responded to her complaints about VT's physical and emotional abuse, and she also has brought claims alleging breach of contract, negligent infliction of emotional distress, and negligent retention.[2] Pending before the Court are the parties' cross-motions for summary judgment. For the reasons explained below, the Court will grant summary judgment in favor of defendant.

The pleadings in this case chronicle a disturbing saga of a dangerous attraction between a young woman with a prior history of emotional problems and a very troubled, possessive, and ultimately abusive young man. Plaintiff maintains that the school fell short of its statutory

---

1    Plaintiff refers to this student as "VT" in her complaint, Compl. [Dkt. # 1] ¶ 1, and the Court will do the same here.

2    In a bench ruling issued on June 10, 2016, the Court dismissed plaintiff's claim for promissory estoppel. *See* Min. Entry (Jun. 10, 2016); Jun. 10, 2016 Hr'g Tr. [Dkt. # 15] at 3–4.

obligation as an educational institution to protect her from sexual harassment, and she submits that GW was negligent in performing the duties it owed her as a student when it dealt with her reports about VT. But she has proven neither, and there is no cause of action available to her based on a contract theory.

With respect to Count One, the Title IX count, the Court finds that at certain points in the chronology, the school was on notice that VT's abuse of plaintiff was based on his hostility towards her as a woman and therefore, the statutory obligations were triggered. But GW was not deliberately indifferent to plaintiff's plight when it responded to the information with which it was provided, and it did not violate the statute.

With respect to Count Two, the breach of contract claim, the Court finds that even if the contract between VT and GW was intended to benefit the plaintiff, plaintiff as a third-party beneficiary cannot sue the University for breach since it was the promisee, and not the promisor, in the agreement.

As for negligence, plaintiff's claims fail in the absence of any expert testimony to define the nature of the duty GW owed plaintiff as its student and what the reasonable exercise of professional judgment would have called for under the complicated set of circumstances here. Plaintiff, who suffered from serious mental health problems before she arrived on campus, has also failed to provide any expert testimony on the issue of causation, and there is no evidence tying the emotional consequences she has suffered to GW's conduct, as opposed to the abuse perpetrated by VT or other contributing factors.

Finally, plaintiff has failed to establish the necessary predicates for a negligent supervision claim: a duty on the part of GW, the employer, that arises from a source other than a statute, and a showing that the employee himself engaged in tortious behavior.

As the hearing in the case made clear, plaintiff simply cannot place her finger on the specifics of when and how GW dropped the ball in her case. Notwithstanding the evidence of their apparent immaturity and mental health issues, plaintiff and VT were legally adults when they stepped under the University's umbrella, and given overlapping statutory obligations and privacy requirements that constrain educational institutions, the school could not do more at various critical junctures without plaintiff's consent. Also, the school owed certain duties to VT, and there were points where it may have been bound to take his rights as an accused into account.

More important, at the end of the day, the University's conduct can only be measured against what it knew at any given time. Thus, one cannot ignore the fact that GW's ability to carry out its obligations in this case was complicated by the many occasions in which plaintiff misrepresented or failed to disclose critical information about her ongoing contacts with VT. Indeed, it appears that GW's efforts were often undermined by plaintiff's unfortunate and repeated decisions to welcome VT back into her life – both online and in person. Counsel for plaintiff posited at oral argument that a more vigorous approach by the school under the specific auspices of Title IX could have made a difference, since skilled counseling might have enabled plaintiff to separate herself from the cycle of attraction, manipulation, and abuse sooner. It may very well be that the contacts plaintiff reinitiated were more of a symptom than a cause of the abuse she suffered, but there is no question that throughout this period, the University repeatedly offered to provide her with the counseling she sorely needed, and it offered her access to additional resources and tools to enforce a separation from VT, but she declined to accept that assistance.

The Court is not suggesting in any way that this survivor is to blame for her own ordeal. But the case is here for decision because plaintiff has taken on the burden of proving that the University was responsible for the emotional distress she suffered in the wake of this relationship.

The school is to be judged based on the known circumstances, and when one considers the circumstances known to the school at the time of plaintiff's reports, it is apparent that the situation was never cut and dried, and it did not then and does not now lend itself to easy solutions. The Court is not empowered – and it lacks the expertise in any event – to decide whether as a matter of sound educational policy or mental health practice, the school could or should have taken a different step, or adopted a preferable course of action, at any particular time. The Court is required to apply the applicable legal standards, which establish a very high bar for plaintiff to satisfy in order to obtain the monetary damages she seeks. A review of the entire record – which necessarily will be set out in great detail below – makes it clear that plaintiff has not met that burden.

## FACTUAL BACKGROUND

In the autumn of 2010, Ricca Prasad entered George Washington University as an undergraduate student. *See* Pl.'s Statement of Undisputed Material Facts [Dkt. # 81] ("Pl.'s SOF") ¶ 1; Def.'s Statement of Undisputed Material Facts [Dkt. # 60-5] ("Def.'s SOF") ¶ 1. The evidence shows that plaintiff struggled with emotional and psychological issues in her adolescence and received treatment for them before she ever arrived on campus. *See* Dep. of Ricca Prasad, Pl.'s Ex. 38 ("Prasad Dep.") at 242:8–243:1, 250:1–251:2; ███████████████████████████████████ ███████████████████████████████; *see also* Email of Nov. 20, 2012 from Pl. to VT, Def.'s Ex. 18, at AA0004288 ████████████████████████████████████ ████████████████████████████████████████████████████████[3]

Nonetheless, her freshman year began on a positive footing. She did well in her classes and

___

[3]     Plaintiff's exhibits appear on the docket under seal at Dkt. ## 65–80. Defendant's exhibits appear on the docket under seal at Dkt. ## 61–62. The Court will refer to each exhibit by exhibit number as assigned by the parties and will use the Bates numbers on each exhibit for pin cites.

participated in the life of the university, succeeding in academic competitions and taking an active role in various campus groups.  Pl.'s SOF ¶ 27; *see also* Def.'s SOF ¶ 1 (describing plaintiff's successful academic undergraduate record).

## I.  Plaintiff Met VT During Her Freshman Year

In early 2011, during the spring of her freshman year, plaintiff met VT, and a romantic relationship developed.  Pl.'s SOF ¶ 28.  Plaintiff ended the relationship at the end of the semester, but the two resumed contact in August of 2011.  *Id.* ¶¶ 28–29.  In September, VT stayed in plaintiff's dorm room for three weeks before he left to study abroad in London for the 2011–12 academic year.  *Id.* ¶ 29.

In his absence, plaintiff dated other students, and this did not sit well with VT in London.  He began sending harassing and threatening emails, Facebook messages, and other communications to plaintiff, her friends, and the other students she dated.  *See, e.g.*, Pl.'s SOF ¶¶ 30–32; Facebook Messages, Pl.'s Ex. 6, at AA0000601–624 (messages dated Oct. 30, 2011 to Jan. 18, 2012).  VT used coarse, violent, and explicitly sexual language when he threatened both plaintiff and her friends.  *See id.* at AA0000602 (referring to plaintiff as a "stupid cunt whore" whom he "fuck[ed] every day"); *id.* at AA0000620 ("i wish i could kill u and get away with it"); *id.* at AA0000621 (referring to plaintiff as a "dirty whore"); *id.* at AA0000623 (threatening that "one day i will FIND you wherever you are and fuck you mercilessly").  According to a timeline that plaintiff appears to have prepared for this litigation, she began having panic attacks in November of 2011.  Pl.'s Timeline, Pl.'s Ex. 29, at RFP 000940.

## II.     The University Imposed the First No Contact Order

On January 17, 2012, plaintiff first brought the threatening nature of VT's messages to the GW Police Department ("GWPD").  Incident Report of Jan. 17, 2012, Pl.'s Ex. 6, at AA0000600.[4] GWPD advised her to change her email address[5] and gave her a "resource card" if she needed to speak to a counselor.  *Id.*  On January 23, 2012, she reported the messages to GW's Office of Student Rights and Responsibilities ("OSRR").  OSRR Investigative Report, Pl.'s Ex. 6, at AA0000625.  The next day, plaintiff emailed VT stating that would be the last time she contacted him while also apologizing "for the trouble that going to [University Police Department] will have caused."  Email of Jan. 24, 2012 from Pl. to VT, Pl.'s Ex. 131, at AA0004895.  And on January 25, the University issued No Contact Orders ("NCOs").  NCO of Jan. 25, 2012, Pl.'s Ex. 6, at AA0000598 (NCO directing VT not to contact plaintiff and another unidentified individual); NCO of Jan. 25, 2012, Pl.'s Ex. 6, at AA0000597 (directing plaintiff not to contact VT); Def.'s SOF ¶ 8.

On January 26, 2012, plaintiff went to the GW counseling center in connection with an "[e]motionally abusive relationship," but she did not seek further sessions there because of

---

[4]     Handwritten notes on the report suggest that GWPD received other reports about VT on "9/19/09 - 0907995" and "10/29/11 – 1110019."  Pl.'s Ex. 6, at AA0000600 (referring to the date and the GWPD Report number of each).  The first note about a 2009 report was made before plaintiff was a GW student and appears to concern a report filed by another student, *see* Pl.'s SOF ¶ 24, and the record indicates that the second note refers to a report plaintiff made to GWPD while VT was in London "due to her concern for [VT] making suicidal statements."  OSRR Admin. Action /Additional Correspondence, Pl.'s Ex. 10, at AA0000493; Prasad Dep. at 10.

[5]     Plaintiff testified that GW's information technology support personnel would not permit her to change her email address, Prasad Dep. at 17:8–18; 19:1–13, and told her instead to filter VT's emails to go directly to her trash folder.  Pl.'s Suppl. Resp. to Def.'s First Set of Interrogs., Pl.'s Ex. 37, Resp. 11.  According to plaintiff, filtering VT's emails was ineffective because VT used at least five different email accounts to send messages to her University email account.  *Id.*

scheduling issues. Pl.'s SOF ¶ 33; Mental Health Servs. File, Pl.'s Ex. 3, at RFP 001589 (indicating she would rather use her insurance to find another counselor).

On February 6, 2012, plaintiff sent GWPD investigator Jason Engel copies of the messages from VT that she had previously provided to OSRR. Email of Feb. 6, 2012 from Pl. to Engel, Pl.'s Ex. 40, at AA0009394–417. Engel gave plaintiff GWPD's emergency contact number and the name and contact information for its Coordinator of Victims' Services Erin Harpine, in case VT returned to campus from London and threatened her. Email of Feb. 7, 2012 from Engel to Pl., Def.'s Ex. 81, at AA0009393. He told her that Harpine could provide her with more information on how to obtain a Temporary Restraining Order or a Civil Protection Order from D.C. Superior Court. *Id.* On March 19, 2012, Engle contacted plaintiff again because he was informed by plaintiff's family that VT might have been back on campus. Email of Mar. 19, 2012 from Engle to Pl., Def.'s Ex. 82, at AA0009391. He gave her GWPD's and Harpine's contact information again, and noted that Harpine was in charge of the department's Violence Awareness Program. *Id.* Plaintiff did not contact Harpine. Prasad Dep. at 30:7–31:3.[6]

---

6     Separately, the University provided all students with information about where to go if they became a victim of sexual misconduct. It did this through University-wide emails called "InfoMail," an online University newsletter called "GWToday," and a University website called "Haven." *See* "Be Knowledgeable About Sexual Assault," InfoMail (March 20, 2012), Def.'s Ex. 35, at AA0014607–08 (identifying resources available to sexual assault victims in the University community); InfoMail (Sept. 23, 2014), Def.'s Ex. 34, at AA0008301–02 (describing the University's Sexual Assault Response Consultation Team); "Zero Tolerance for Sexual Violence," GWToday (Sept. 6, 2012), Def.'s Ex. 36, at AA0014617–20; Dep. of Tara Pereira, Pl.'s Ex. 12 & Def.'s Ex. 31 ("Pereira Dep."), at 50:14–51:8, 64:15–65:1 (testifying that the University publicized to students a website called "Haven" through which one could access the Title IX office). Plaintiff received or had access to these publications and emails while attending GW. Prasad Dep. at 201:2–19, 204:2–12.

Notwithstanding the fact that the No Contact Order was in place, the record reflects that plaintiff communicated with VT. Prasad Dep. at 29:5–8; *see* Facebook Messages, Def.'s Ex. 4, at RFP 000221 (showing messages dated March 9, 2012 and later). While she told him not to send more emails, Email of May 16, 2012 from Pl. to VT, Def.'s Ex. 10, at AA0004772 ("I will not be talking to you for at least another month, probably longer. . . . I will not be responding/reading any emails from you."), she also gave him instructions on how to transmit material to her through other means. *Id.* (giving VT an address to which he could mail a flash drive). Plaintiff testified in deposition that she did not recall the flash drive referenced in the email, but she stated that she gave VT the address of a friend to use █████████████████████████████████████

████. Prasad Dep. at 31:7–34:13.[7] Plaintiff also reports that during the time between February and June 2012, she "developed problems sleeping for the first time," and "began having anxiety attacks more frequently." Pl.'s Timeline, Pl.'s Ex. 29, at RFP 000941. But she continued to communicate with VT during the summer of 2012, *see* Facebook Messages, Def.'s Ex. 4, at RFP 000140–183, and on August 26, 2012, they met in person. *See* Email of Aug. 26, 2012 from Pl. to VT, Def.'s Ex. 11, at RFP 000572; Prasad Dep. at 37:11–39:4 (testifying that she wanted to meet "for closure" before she left for the fall semester to study abroad).

In the fall of 2012, plaintiff left the United States to study in Barcelona for a semester, Prasad Dep. at 39:5–16, while VT returned to GW after his year in London. *See* Academic Tr. of

---

[7] ████████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████████████
████████████████████████████████████████ (The Court notes that the parties have not requested a formal transcript of their arguments on the motion from the court reporter. Accordingly, the Court's citations to the transcript are from the court reporter's rough draft of the proceedings.)

VT, Pl.'s Ex. 81, at AA0001110–11.  While she was in Barcelona, plaintiff experienced a number of disturbing encounters unrelated to VT.



While she was abroad, plaintiff did not see VT in person, Prasad Dep. at 39:17–19, but she continued to communicate with him through LinkedIn and other means.  *Id.* at 40:9–43:9; LinkedIn Message of Sept. 18, 2012 from Pl. to VT, Def.'s Ex. 12, at AA0007691; Email of Sept. 18, 2012 from Pl. to VT, Def.'s Ex. 13, at AA0004426; Pl.'s Timeline, Pl.'s Ex. 29, at RFP 000941 (stating that VT "helped me get through a lot of my lowest and loneliest moments" while abroad).

On October 18, 2012, plaintiff asked the University to lift the No Contact Order.  Omitting any mention of the ongoing dialogue with VT, she stated:  "I'm currently abroad and have been out of contact with [VT] for a long time, but when I return, I really don't want this order still hanging over my head."  Email of Oct. 18, 2012 from Pl. to OSRR Assistant Director Lindsay McConnell, Def.'s Ex. 16, at AA0010276.  In response, McConnell asked to meet in person to discuss the request when plaintiff returned from Barcelona, but plaintiff insisted that the order be

---

8

lifted before then: "Back in the winter the situation was getting out of control and I can see why the university had to step in, but at this point I don't not [sic] want nor need GW to be involved in my personal life."  *Id.*  In early November 2012, OSRR Director Gabriel Slifka spoke to both plaintiff and VT about the request, advising them that if the order was lifted, it could be reinstated if Slifka believed that was appropriate.  Entries of Nov. 6 and 7, 2012, OSRR File Notes Form, Def.'s Ex. 70, at AA0000475.

### III.    The University Lifted the First No Contact Order at Plaintiff's Request

On January 3, 2013, GW lifted the No Contact Order.  OSRR Admin. Action /Additional Correspondence, Def.'s Ex. 19, at AA0000585–90.  This rescission allowed VT to visit university housing again.  *Id.* at AA000587.

In early 2013, plaintiff returned to GW from Barcelona, and she and VT "began a committed," but tumultuous, relationship.  Pl.'s Timeline, Pl.'s Ex. 29, at RFP 000941–42.  During this time, the two exchanged hundreds of text messages, Text Messages from Jan. 1, 2013 to Mar. 21, 2013, Def.'s Ex. 20, at RFP 000574–809, and ███████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████

The record also shows that their consensual sexual relationship included a violent component, with plaintiff punching VT.  *See* Email of Mar. 29, 2013 from VT to Pl., Def.'s Ex. 24, at AA0003908 ("My jaw still feels a little funny from u hitting me but i def needed that!!");  Prasad Dep. at 66:21–67:9, 168:10–169:3 (testifying that plaintiff "hit him with permission," that VT had "on past occasions invited [her] to hurt him physically in different ways, and in this

instance I was angry with him and asked if I could hit him, and he said yes," ████████

███████████████████████████████████████ ").

On March 7, 2013, OSRR further amended VT's status to allow him to reside in University housing for the remainder of the academic year. Letter of Mar. 7, 2013, Pl.'s Ex. 26, at AA0000778. VT moved back on campus shortly thereafter. *See* Email of Mar. 31, 2013 from VT to Slifka, Pl.'s Ex. 26, at AA0000772.

## IV.    VT Assaulted Plaintiff and the University Imposed a Second No Contact Order

Sometime in early 2013, plaintiff ended her relationship with VT, *see* Pl.'s Timeline, Pl.'s Ex. 29, at RFP 000942, and once again, this prompted an angry reaction. On March 30, 2013, plaintiff agreed to meet VT at a park adjacent to campus, and there, he "yelled in [her] face that he had raped her," Pl.'s Statement of Disputed Material Facts [Dkt. # 81] ("Pl.'s SODF") ¶ 21, "pinned her to the railing over the highway," and "tackled her down to the ground" when she tried to leave. Pl.'s SOF ¶ 59, quoting GWPD Incident Report of Apr. 1, 2013, Pl.'s Ex. 7, at AA0000575. She fled, and VT chased her back onto campus, yelling and grabbing at her as she tried to get away from him. *Id.* Emails that they exchanged the following day show that both were intoxicated at the time:

> I didn't know you were drunk until after it happened and I realized today. Otherwise I never would have seen you. And it just so happened it was the one day where I had day drank heavily and accidentally let myself get into that situation. I hope your therapist helps. I will be doing the no contact order though.

Email of Mar. 31, 2013 from Pl. to VT, Def.'s Ex. 25, at AA0003809; *see also id.* at AA0003810 ("It's hard for me to remember everything too because I was drunk and panicking and in shock.").

On April 1, 2013, plaintiff reported the assault to GWPD, and although she did not identify VT in the report by name, she "stated that she had filed a previous complaint that involved [the

unknown suspect]." GWPD Incident Report of Apr. 1, 2013, Pl.'s Ex. 7, at AA0000575–78. GWPD classified the incident as "Simple Assault (Domestic Violence)." *Id.* In the report, plaintiff emphasized: "I am documenting this incident to start a paper trail, but do not wish to take any further action at this time." *Id.* at AA0000578.

That same day, plaintiff told Angela Esquivel, one of her professors who also worked at GW's Center for Student Engagement, about the attack. Pl.'s SODF ¶ 22. Esquivel immediately issued No Contact Orders between plaintiff and VT, Apr. 1, 2013 No Contact Orders, Pl.'s Ex. 7, at AA0000571–72, and she emailed other GW personnel about the assault. Email of Apr. 1, 2013 from Esquivel to D. Lico, copying A. Goretsky, T. Miller, and Slifka, Pl.'s Ex. 47, at AA0010492–93. Esquivel described the incident to her colleagues as "physical in nature, involving him pinning her up against the E street bridge and the later tackling her to the ground." *Id.* at AA010493. Esquivel also spoke to VT and told her colleagues his version of the incident:

> He initially denied that a physical altercation had taken place, but soon after, said that what happened was "debatable from horseplay." He also said that "If something physical happens, I make sure she doesn't get hurt." He also stated that "When she gets crazy, if I have to put her down, it will be on the bed, not on the floor or the wall."

*Id.* Danielle Lico, Associate Dean of Students, Administrative Services and Senior Advisor for GW, replied:

> I'm going to chat with [GW's Deputy Title IX Coordinator and Assistant Dean of Students] Tara [Pereira] about [plaintiff] as well and see if she thinks we need to reach out given that there may be a sexual assault history here as well. Even though she didn't file a report about that, she did make the university aware of something that "may" have happened in the past.

*Id.* at AA0010492.

That same day, plaintiff emailed VT, alerting him that he was about to be served with a No Contact Order. Emails of Apr. 1, 2013, Def.'s Ex. 38, at AA0003589–92; *see also* Prasad Dep. at

12

82:16–83:18.  VT replied:  "I do not want u to have any hearings/ trouble."  Emails of Apr. 1,

2013, Def.'s Ex. 38, at AA0003590.  Plaintiff assured him there were not going to be any hearings

because she was not pressing charges, but she warned she might "if anything else happens."  *Id.* at

AA0003589–90.

Plaintiff was under the impression that the school could not take action against VT until

she formally identified him to GWPD, even though University personnel knew he was her attacker.

> My understanding was that his name had to be formally attached to the
> report, so my understanding from Slifka, which was relayed to me through
> Ms. Esquivel when I asked this question was, he knew who it was.  He put
> the pieces together, but could not proceed to take action unless I formally
> documented [VT]'s name.

Prasad Dep. at 85:15–22.

On April 12, 2013, plaintiff met with OSRR Director Gabriel Slifka to discuss the assault,

and he informed her that he could take action against VT even if she had not formally identified

him.  Prasad Dep. at 93:16–94:18.

> I recall expressing I was upset to hear that because I had been informed
> when Angela [Esquivel] called him that that was not the case, so I felt I had
> been deceived.  He asked me for input on what actions I thought should be
> taken.  He also mentioned that typically in response to assault, the sanction
> was suspension . . . . [G]iven the nature of my past relationship with [VT],
> he was wondering if . . . that would be an appropriate response I guess.

*Id.* at 94:16–95:7.  In a ████████ dated that same day, plaintiff wrote that Slifka "doesn't get

to make the decision about V's suspension, but he gets a say.  And he wanted my opinion.  I had

no idea that that was what the meeting would be.  I really do appreciate it though."  ████████

████████████████████████████████████

Plaintiff did not seek to pursue suspension.  She told Slifka in an email a few days later:

> I wanted to write to follow up with the meeting we had on Friday.  I have
> thought about it a lot and talked it over with friends and family, and I wanted

> to let you know that my basic opinion has not changed. I still think that the best thing for [VT], me, and the GW community would be to allow him to graduate, leave DC, and move on with his life. . . .
>
> I know it's a difficult decision. I really do believe there are other better options than suspension though. Thanks again for including me in this process.

Email of Apr. 16, 2013 from Pl. to Slifka, Pl.'s Ex. 50, at RFP 001338. During the course of this litigation, plaintiff testified that she feared retaliation from VT at that time, and that she had been concerned "that if he was suspended and returned, this situation could repeat itself, and [she] was also very confused and still cared for [VT]." Prasad Dep. at 95:15–19. She also testified that it would have been reasonable for Slifka to interpret her email to mean that she did not want VT to be suspended. *Id.* at 96:10–16.

At that point, the OSRR did bring the school's Title IX office into the conversation. GW's Deputy Title IX Coordinator Tara Pereira testified that plaintiff met with her at some point after the assault at the request of OSRR Assistant Director Lindsay McConnell. Pereira Dep. at 111:4–112:18. Pereira did not formally refer plaintiff to specific Title IX resources at that time "because [plaintiff's] concerns that she shared with me were not Title IX concerns." *Id.* at 114:02–05; *see also id.* at 117:8–15 ("[T]here was no sexual piece to anything she shared with me or anything she shared with Lindsay in front of me."). According to Pereira, "[i]t is up to the student to decide which of the resources provided he or she wants to be given, to engage in, to have the University help them with." *Id.* at 102:17–19. "[T]he door was left open that if [plaintiff] wanted to meet with me again or avail herself of any of the additional resources outside of what she and Lindsay were going to be doing, then she could. . . . It was up to her to let me know if there was anything she needed." *Id.* at 250:6–14.

By this time, Suzanne Combs had succeeded Erin Harpine as GWPD's Coordinator of Victims' Services. Dep. of Suzanne Combs, Pl.'s Ex. 25 & Def.'s Ex. 32 ("Combs Dep."), at 14:10–17:8. Combs testified that Pereira reported that she was having difficulty getting in contact with plaintiff, who was "wishy-washy about what she wanted to do," and that Pereira asked her to help. *Id.* at 34:17–35:8.

During this period when University personnel were meeting with plaintiff about the March 30 attack and determining how to proceed, plaintiff and VT continued to communicate and meet in person. They met at plaintiff's request on April 6, 2013, when she told VT she wanted to talk about "the events of the past week," Prasad Dep. at 90:14–91:6; Email of Apr. 6, 2013 from Pl. to VT, Def.'s Ex. 39, at AA0003347, and they met again on April 12. *See* Pl.'s SODF ¶ 36; *see also* Emails of Apr. 12, 2013 between VT and plaintiff, Def.'s Ex. 40, at AA0003222–23. The day after plaintiff told Slifka that it would be better to let VT graduate, she emailed VT to say she might meet him the next week for dinner, and in a separate email, she suggested they meet in the library. Emails of Apr. 17, 2013 from Pl. to VT, Def.'s Ex. 42, at AA0003163. ███████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

██████████

On April 24, 2013, plaintiff acknowledged to Slifka that she had violated the No Contact Order, and stated that she wanted to formally identify VT as her assailant.

> I wanted to give you an honest update in regards to the contact between [VT] and I, because I now feel harassed. A week after the incident in the park, before I met with you, I violated the no-contact order and asked [VT] to meet with me. I saw him throughout the following week. For a long time, he has been basically my entire support system, which makes it very

> difficult to stay away from him, even when he is the one hurting me.
> However, with the help of UCC and after my meeting with you, I was able
> to break it off fully again by the end of that weekend. . . . I have made it
> clear to him through email that I do not want to see or speak to him ever
> again. . . . I have also decided at this point to make the UPD report no longer
> anonymous.

Email of Apr. 24, 2013 from Pl. to Slifka, Pl.'s Ex. 26, at AA0000765. The email to Slifka

included screen shots of sexually explicit messages VT had recently sent to her. *Id.* at

AA0000767–68 ("Guess how many girls I fuked since meeting u" ██████████████

███████████ "i just miss u so fuckin much we can't have sex" "Im drunk. Protected sex?"

"Come have sex with me" "U should let me love u" "Babe u dnt miss me? Remember how happy

i look when we are having sex").

On April 24, plaintiff also reported that she and her roommate believed VT had appeared

outside the window of her dorm room in the middle of the night. Email of Apr. 24, 2013 from Pl.

to Slifka, Pl.'s Ex. 26, at AA0000764. Slifka forwarded plaintiff's email to GWPD Captain

Michael Glaubach, Email of Apr. 24, 2013 from Slifka to Glaubach, Pl.'s Ex. 56, at AA0010471,

and told VT to stop contacting plaintiff in violation of the NCO. Email of Apr. 24, 2013 from

Slifka to VT, Pl.'s Ex. 26, at AA0000763; OSRR Admin. Action /Additional Correspondence,

Pl.'s Ex. 15, at AA0001186 (reflecting that Slifka called and spoke with VT on April 24, 2013 and

"explained that he must cease his communication with Ms. Prasad immediately").

## V.     Plaintiff Identified VT and GW Suspended Him

The following day, on April 25, 2013, plaintiff identified VT to GWPD as her assailant,

but she added that she did not want to notify District of Columbia police or press charges. GWPD

Suppl. Case Report of Apr. 25, 2013, Def.'s Ex. 26, at AA0001162. On April 30, 2013, OSRR

Assistant Director McConnell emailed plaintiff about submitting a formal statement to OSRR. *See*

Email of Apr. 30, 2013 from McConnell to Pl., Pl.'s Ex. 57, at AA0009506. Plaintiff responded on May 2, describing VT's knocking on her dorm room window the night of April 23. Email of May 2, 2013 from Pl. to McConnell, Pl.'s Ex. 26, at AA0000758–61. She also attached messages that VT had sent to her, *id*., and provided them to Slifka as well, telling him that VT was continuing to violate the NCO. Email of May 3, 2013 from Pl. to Slifka, Pl.'s Ex. 26, at AA0000757; *see also* Email of May 3, 2013 from Pl. to Slifka forwarding another string of emails from VT to plaintiff, Pl.'s Ex. 7, at AA0000579–81 ("i mother fucking hate you ricca fuck u bitch," "fuck u u stupid fucking bitch"). Slifka, who had separately forwarded plaintiff's report to GWPD, told plaintiff to contact GWPD to report the violations, and he said that OSRR would contact VT about them too. Email of May 3, 2013 from Slifka to Pl., Pl.'s Ex. 18, at AA0009342.

According to Slifka, plaintiff's formal identification of VT to GWPD on April 25 initiated the disciplinary process against VT. Dep. of Gabriel Slifka, Pl.'s Ex. 13 & Def.'s Ex. 29 ("Slifka Dep.") at 78:22–79:13. On May 10, 2013, OSRR formally charged him with assault, physical abuse, non-compliance with reasonable directions of University officials, and disorderly conduct. Letter of May 10, 2013 from OSRR to VT, Pl.'s Ex. 42, at AA0001154–55. Slifka notified plaintiff that the University would hold a disciplinary hearing and directed her to appear at the hearing as a witness. Letter of May 10, 2013 from OSRR to Pl., Pl.'s Ex. 42, at AA0001156.

The next day, plaintiff asked Angela Esquivel if she would attend the hearing with her, and Esquivel agreed. Emails of May 11, 2013 between Pl. and Esquivel, Def.'s Ex. 47, at AA0013750–51. The hearing, which OSRR Assistant Director McConnell described as "very high level and involv[ing] domestic violence," was set for Tuesday, May 21, 2013. Email of May 15, 2013 from

McConnell to G. Rheault, Pl.'s Ex. 67, at AA0010257.[9]  But the hearing was set for the day after plaintiff had planned to leave town, so she informed school officials that she would not appear in person.

> I wanted to let you know that I will be doing the testimony via phone.  They are scheduling it for next week and I'll be gone anyway.  Thanks for offering though and have a great summer!!!

Email of May 15, 2013 from Pl. to Esquivel, Def.'s Ex. 47, at AA0013750.

While the University was preparing for the disciplinary hearing, plaintiff and VT resumed communications.  The record shows that on May 12, 2013, VT asked plaintiff to go on a date.  Emails of May 12, 2013 between Pl. and VT, Def.'s Ex. 48, at AA0002164–66.  She responded, "I would never go on a date with you . . . I would go see the great gatsby with you.  I cannot be alone with you." *Id.* at AA0002165.  According to plaintiff, she went to the movie with VT as a "final goodbye" that would provide "some sort of closure to [her] so [she] could move on and not see him again."  Prasad Dep. at 116:11–117:17.  She did not tell Esquivel that she went to the movie with VT.  *Id.* at 120:19–121:6.  The record also indicates that sometime in mid-May, plaintiff and VT ran into each other in a hospital emergency room, where VT screamed at her and grabbed her and tried to forcibly kiss her.  *See* GWPD Incident Report, Jul. 22, 2013, Pl.'s Ex. 10, at AA0000518; █████████████████████████████

---

9    McConnell asked plaintiff for her availability and stated she was trying to schedule the hearing for Friday, May 17, but that it would more likely take place the next week.  *See* Email of May 15, 2013 from McConnell to Pl., Pl.'s Ex. 65, at AA0009295–96.  Plaintiff responded that she was unavailable on Monday, May 20 because she was moving and flying home that day.  *Id.* The hearing was scheduled for Tuesday, May 21.  *Id.*

As the school year came to a close, plaintiff sent an email to Slifka that described ways in which the process of handling complaints could be improved in the future [10] and also thanked him:

> I am glad GW has taken the situation between [VT] and me seriously, listened to my complaints, and included my input in the decision-making process. . . . Overall, I do feel like I am leaving this university with the situation having been addressed, so thank you.

Email of May 13, 2013 from Pl. to Slifka, Def.'s Ex. 49, at AA0009306–07.

On May 14, 2013, GWPD Victims' Services Coordinator Combs sent plaintiff an email with links to various resources and information about how plaintiff could obtain a court-issued Temporary Protection Order to keep VT away from her in the future. Email of May 14, 2013 from Combs to Pl., Pl.'s Ex. 79, at ID 000137; Combs Dep. at 66:5–17. Plaintiff thanked Combs for the information but did not take steps to obtain an order at that time. *See* Email of May 14, 2013 from Pl. to Combs, Pl.'s Ex. 79, at ID 000137.

The OSRR University Hearing Board held the disciplinary hearing on May 21, 2013. Def.'s SOF ¶ 45; Pl.'s SOF ¶ 106. Plaintiff participated by telephone, and she later testified in her deposition that although she was not physically present, there was nothing she wanted to say at the hearing that she was prevented from saying. Prasad Dep. at 134:17–135:9.

---

10    Email of May 13, 2013 from Pl. to Slifka, Def.'s Ex. 49, at AA0009306–07 ("The first is that I felt blindsided when you said your office would have to take action against [VT] regarding the UPD report that I filed against perpetrator anonymous. . . . I also wish I had been informed (and maybe someone casually mentioned it at some point, but I don't think that they did) that by filing the complaints, I would be obligated to serve as a witness at his hearing and that he gets the chance to question me. . . . Furthermore, it seems like the process could be streamlined. I feel like for every incident (the park, the no contact order violations) I was supposed to report it to UPD, alert your office, and then give your office an official statement. I understand why documentation is so important and that UPD is separate from your office, but it seems like there could have been a little more communication to make the process easier. . . . Anyway, I wanted to say this once again because I know it's the policies in place and not the staff that are responsible for the flaws in the system.").

Relying on her statements and on OSRR and GWPD reports, the disciplinary board found that VT had assaulted and physically abused plaintiff, he had violated the April 1, 2013 No Contact Order, and he had harassed and threatened plaintiff, and that therefore he was in violation of the prohibition against disorderly conduct. OSRR Univ. Hr'g Board-Level Disciplinary Conference Adjudication Report of May 21, 2013, Def.'s Ex. 51, at AA0001145–48. The Board recommended that the University expel VT. *Id*. at AA0001147.

Rather than expel him, the University suspended VT on June 4, 2013 effective May 21, 2013 through the summer 2015 semester. Letter of Jun. 4, 2013, Def.'s Ex. 52, at AA0001149–50. He would receive credit for his course work for the spring, but he was barred from all University property effective June 11, 2013, and he was told that the April 1, 2013 No Contact Order remained in effect. *Id.*

After his suspension, VT began harassing GW personnel. *See* Email of Jun. 10, 2013 from J. Jones to Slifka, Pl.'s Ex. 70, at AA0014089 (describing "a VERY disturbing phone call" from VT in which he conveyed his anger over the hearing's outcome: "You don't want me to explode. You are the reason why i'm going to explode."); *see also* OSRR Admin. Action /Additional Correspondence, Pl.'s Ex. 15, at AA0001183 (noting that on June 10, 2013 VT made "concerning statements" to Jay Jones, Special Assistant to the Dean in the Division of Student Affairs, and that Jones filed a report with GWPD regarding the call). On June 10, 2013, GWPD Captain Glaubach emailed GW officials regarding VT's conduct and wanting to avoid a potential "Tarasoff situation."[11] Email of Jun. 10, 2013 from Glaubach, Pl.'s Ex. 70, at AA0014089.

---

11    At the motions hearing, plaintiff's counsel explained that "Tarasoff is a code word for murder." Dec. 11, 2018 Hr'g Tr. at 27; *see Tarasoff v. Regents of Univ. of Cal.*, 17 Cal.3d 425 (1976) (case involving the murder of a University of California student by another student).

On June 16, 2013, plaintiff texted VT – as opposed to the school – to inquire about the outcome of the disciplinary hearing. Text Messages of Jun. 16, 2013, Def.'s Ex. 20, at RFP 000838. She then emailed Esquivel, calling the result "a victory for justice." Email of Jun. 17, 2013 from Pl. to Esquivel, Def.'s Ex. 53, at AA0013752.

VT appealed the decision, and the University denied the appeal on June 24, 2013. Letter of Jun. 24, 2013 from Slifka to VT, Pl.'s Ex. 73, at AA0001133; Def.'s SOF ¶ 50. Apparently Slifka had been awaiting the outcome of the appeal to notify plaintiff of the decision; he testified that he did not tell her the result before then because the appeal was still pending, *see* Slifka Dep. at 173:15–176:5, and according to OSRR notes, he spoke to plaintiff on June 26. OSRR Admin. Action /Additional Correspondence, Entry of Jun. 26, 2013, Pl.'s Ex. 15, at AA0001179. Slifka told plaintiff about VT's suspension and that the No Contact Order would remain in place. Prasad Dep. at 144:7–12.

Following the denial of the appeal, VT's harassment of GW officials continued. *See* GWPD Incident Report of Jul. 1, 2013, Pl.'s Ex. 75, at AA0001527–30 (reporting harassing emails and false food delivery sent to school personnel); GWPD Incident Report, Aug. 28, 2013, Pl.'s Ex. 26, at AA0000642–43 (reporting threats from VT to ruin Slifka's "reputation via electronic measures" and false subscriptions to pornography and other websites); *see also* ███████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████

On July 5, 2013, GWPD Captain Glaubach emailed GW Senior Associate Dean of Students Mark Levine, questioning efforts to get VT through to graduation:

> i think now is when [we] really want to question the "let's help him to graduate approach" and look at the "let's separate him permanently because our employees should not have to take this kind of abuse approach.

Email of Jul. 5, 2013 from Glaubach to Levine, Pl.'s Ex. 76, at AA0012632. Levine replied that they should "regroup . . . and talk options. Us offering to allow him to take his last two classes elsewhere might be the way to go, but it doesn't have to be put on the table to him quickly. He still needs consequences for his behavior." Email of Jul. 8, 2013 from Levine to Glaubach, Pl.'s Ex. 76, at AA0012632.

After VT's suspension, plaintiff did not see VT again until 2015, Prasad Dep. at 148:5–15; 153:6–155:1, though VT continued to communicate with her. *See* Facebook Messages from Jun. 2, 2014 through April 17, 2014, Def.'s Ex. 4, at RFP 000059–65; Text Messages from Jun. 6, 2013 through Jul. 20, 2013, Def.'s Ex. 20, at RFP 000837–46. In July 2013, she reported violations of the NCO to Suzanne Combs, *see* Email of Jul. 21, 2013 from Pl. to Combs, Pl.'s Ex. 79, at ID 000138, who reported them to GWPD. GWPD Incident Report of Jul. 22, 2013, Pl.'s Ex. 8, at AA0001512–25 (stating that plaintiff had told Combs she was "fearful of [VT] returning to campus in the fall" when plaintiff would be back on campus for her graduate studies).[12] Combs emailed plaintiff in response:

> Your report number is #1304987 for what we discussed yesterday. I spoke with the investigators and they need a couple of things from you to solidify your evidence (and to prepare for [Metropolitan Police Department's] involvement).

---

12    Plaintiff returned to the University in fall 2013 to continue her joint degree program. Prasad Dep. at 6:1–6.

Email of Jul. 23, 2013 from Combs to Pl., Pl.'s Ex. 79, at ID 000138. Combs gave plaintiff specific instructions on how to transmit to GWPD VT's texts, emails, and voicemails, and she added:

> I know this is a lot to do, but we want to make sure your case is strong and complete. You have the evidence and a good chance of getting a protection order through DC, so we want to make sure all of our evidence meets the standards. We don't want to give them any reason to deny it. If any of this is too much, you can give me a call and I can help you walk through it.

*Id.*

A week later, plaintiff followed up with Combs with the evidence she had gathered but redacted portions of the material and explained her decision not to pursue the protective order.

> I blacked out some of the text from the PDF emails because the information was too personal. I don't know if this is sufficient for GW's case. But it's all I am willing to give. I started going through my text history, and I realized it's just too painful. I don't really care about the protection order. . . . I feel like it will keep me safer and healthier to put all of this out of mind as much as possible instead of going through it all and trying to take any action. . . . I really appreciate your help though. Thanks.

Email of Jul. 29, 2013 from Pl. to Combs, Pl.'s Ex. 79, at ID000139. When the redactions she made to the emails did not properly mask the text that plaintiff wanted blacked out, she told Combs "if the detailed emails aren't enough, I really don't care if GW takes action or not." *Id.*

During July 2013, the University was also engaged in a discussion about what to do about VT going forward. On July 24, 2013, GWPD Police Chief Kevin Hay sent an email to Gabriel Slifka and Mark Levine with the subject "Cyber-stalking."

> Based on his gross misconduct ignoring the no contact order and his history. I believe [O]SRR needs to take more affirmative action with this case . . . . When you see the evidence collected in the case . . . , we should talk about additional sanctions. We might consider convening a Threat Assessment Team to conclude this matter . . . . His obsessive behavior indicates he will most likely come to GW to stalk Ms. Prasad when classes resume.

Email of Jul. 24, 2013 from Hay to Slifka and Levine, Pl.'s Ex. 80, at AA0010685–6.  Shortly thereafter, the University issued an order barring VT from all University property which stated that he would be subject to arrest if he was found there.  Interdepartmental Mem. of Jul. 29, 2013, Pl.'s Ex. 81, at AA0001115.

In late August of 2013, plaintiff told Combs for the first time that VT had sexually assaulted her two years earlier – a total of five times in 2011.  *See* Coordinator Victim Servs. Report Form, Aug. 29, 2013, Pl.'s Ex. 11, at AA0001933 ("3/2011 2x . . . 12/2011 3x"); Confidential Sexual Assault Report Form, Aug. 29, 2013, Pl.'s Ex. 11, at AA0001934.[13]  But even then, plaintiff explicitly directed Combs to keep the information confidential.  Combs Dep. at 262:22–263:8 (stating plaintiff "didn't want [the information] to go anywhere").  Combs told plaintiff about the Title IX resources that GW could offer if she ever needed them, or if she changed her mind about reporting the sexual assaults.  *Id.* at 303:4–305:21.  Without identifying plaintiff, Combs reported the assault allegations to Deputy Title IX Coordinator Pereira and included them in the list of

---

[13]    The record shows that plaintiff's report to Combs was not based on her memory of being assaulted, but on VT's statements informing her that he had raped her on prior occasions when she had blacked out.  *See* Text Message of Dec. 10, 2012 from VT to Pl., Def.'s Ex. 4, at RFP 000076 ("i raped u more than once. maybe two or three times."); ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████ *see also* Pl.'s SODF ¶ 27 ("Ms. Prasad did not know that VT had raped her when she met with Ms. McConnell in January 2012."); Physician's Progress Notes, Feb. 5, 2014, Pl.'s Ex. 102, at AA0014860 ("During this period [as a freshman in college], she was . . . sexually assaulted.  She recounts at least 3 times; however, this was in the context of having a blackout.  She states that she realized that she was sexually assaulted after the fact, she does not remember the details of the sexual trauma.").

sexual assaults the school was required to provide to the Department of Education. *See id.* at 54:2–8, 259:16–263:11; 313:11–314:22.[14]

In the fall of 2013, plaintiff returned to campus as a graduate student, and she obtained a Temporary Protection Order from D.C. Superior Court, barring VT from contacting or communicating with her. Temporary Protection Order (Sept. 30, 2013), Def.'s Ex. 57, at AA0008751. It remained in effect through November 5, 2013. *See* Email of Oct. 21, 2013 from Pl. to Combs, Pl.'s Ex. 87, at AA0007832 (sending the order to Combs). Plaintiff has testified that VT did not violate the Temporary Protective Order. Prasad Dep. at 162:8–10.[15]

## VI. The University Agreed to Let VT Earn His Degree with Conditions

On October 29, 2013, GW and VT entered into an agreement. Letter of Oct. 29, 2013 from GWU to VT, Def.'s Ex. 61, at AA0001501–02 ("October 2013 Agreement" or "Oct. 2013 Agreement"). VT needed two more classes to graduate with a double major in Sociology and Economics, and the University agreed that he could finish his degree by completing those classes somewhere other than GW if he fully complied with a number of conditions – among them that he "remain in compliance with the No Contact Order issued . . . on April 1, 2013" for three years. *Id.* at AA0001501.

At the same time, plaintiff was working with a lawyer to have the Temporary Protection Order against VT, which was set to expire on November 5, replaced with a Civil Protection Order,

---

[14]     On March 17, 2014, plaintiff told a GW professor that she needed to sit out a class about dating violence because, as a "survivor of multiple sexual assaults," she found the class to be "triggering." Email of Mar. 17, 2014 from Pl. to A. Vyas, Pl.'s Ex. 108, at AA0013646. She also testified that she missed classes in the spring of 2013 due to mental health symptoms. Prasad Dep. at 226:18– 227:11.

[15]     ██████████████████████████████████████████████████████████████

which would remain in place for a year. *See* Emails of Oct. 30, 2013 between Pl. and M. Ornstein, Def.'s Ex. 58, at AA0008409. She told the lawyer: "VT only stopped contacting me once I took legal action," and "UPD only has the power to protect me if I am on campus, which is a small fraction of the time." *Id.* Her lawyer advised her that VT's lawyer said that VT might file a "cross cpo" against her, given "the incident where [VT] baited you into hitting him and kicking him in the crotch." *Id.* Plaintiff ultimately decided not pursue the permanent order, Email of Oct. 31, 2013 from Pl. to M. Ornstein, Def.'s Ex. 59, at AA0008417, and she explained in her deposition in this case that she dropped the matter because she did not want VT to have a public order against that "could affect [her] future in some way." Prasad Dep. at 169:4–15.

In early January 2014, plaintiff unblocked VT on Facebook, which allowed VT to send her messages through its messenger function. *See* Facebook Messages, Def.'s Ex. 4, at RFP 000059–65 (showing messages dated as of Jan. 2, 2014). She testified that she unblocked him so that she could view his posts and photos "to know what his state of mind was since he was continuing to harass [her]." Prasad Dep. at 190:16–191:11, 192:9–16. Plaintiff responded to VT's messages, telling him that he could not be active on her Facebook page and not to "like" things on the page. Facebook Messages, Def.'s Ex. 4, at RFP 000063.[16]

On January 24, 2014, plaintiff told Suzanne Combs, GWPD's Coordinator of Victims' Services, that VT had been communicating with her in a variety of ways, including by text, calling, and Facebook, although plaintiff told Combs she was "not looking to take action at this point."

_____

16      In April 2014, after learning that a friend of VT had been killed in an auto accident, plaintiff called VT, Prasad Dep. at 148:14–149:2, but she also wrote to him: "I called you because your friend died. We will not be communicating about trivial things and I don't want to hear about you missing me. Keep moving forward." Facebook Message of Apr. 17, 2014, Def.'s Ex. 4, at RFP 000059.

Email of Jan. 24, 2014 from Pl. to Combs, Pl.'s Ex. 100, at AA0007828. Combs reported the violations to GWPD the same day. GWPD Incident Report of Jan. 24, 2014, Pl.'s Ex. 9, at AA0001474–75.

## VII. The University Withdrew the October 2013 Agreement

On January 30, 2014, GWPD received a report from University Associate General Counsel Toi Carter about harassing and prank calls VT made to "offices across the university." GWPD Incident Report of Jan. 30, 2014, Pl.'s Ex. 101, at AA0001358–64. Carter notified VT that he "substantially and repeatedly" violated the October 2013 Agreement. Letter of Feb. 28, 2014, Def.'s Ex. 71, at AA0011474–75 (describing VT's "excessive number calls to [Carter's] office, . . . sometimes as many as 80 or more a day, and profanity-laced threats"). The University formally rescinded the October 2013 Agreement on March 19, 2014 and reinstated the June 4, 2013 suspension. Letter of Mar. 19, 2014, Def.'s Ex. 73, at AA0011566–68 ("The university has withdrawn its consent to awarding your degree and the [OSRR] is proceeding in accordance with the terms of the June 4, 2013 letter . . . because of your failure to meet academic and other conditions described in the October 29, 2013 Agreement.").

## VIII. The University ██████████████████████████ Granted VT an Ungraduated Degree Retroactively



the University granted him an undergraduate degree in July 2014 retroactive to May 2013. *Id.*; Email of Jul. 7, 2014 from J. Porra to Registrars Off. Graduation MV Campus, Pl.'s Ex. 109, at

AA0013279–82. ███████████████████████████████████████████

████████████████████

In the fall of 2014, plaintiff moved to Tampa, Florida to live with her brother and sister-in-law, and she undertook her graduate courses for that semester by distance learning. Prasad Dep. at 214:11–21. By this time, she had not seen VT in fifteen months. *Id.* at 215:14–216:1. VT was no longer living on campus or taking courses, although plaintiff testified that he maintained ties with his GW fraternity and visited the campus. *Id.* at 192:17–194:1.

In November and December of 2014, plaintiff reported to GWPD and OSRR that VT had violated the NCO by communicating with her while she was in Florida. *See* GWPD Incident Report of Nov. 14, 2014, Pl.'s Ex. 10, at AA000495–96; Email of Nov. 18, 2014 from Pl. to Slifka, Pl.'s Ex. 116, at AA0009724–25; GWPD Suppl. Case Report of Dec. 4, 2014, Pl.'s Ex. 10, at AA0000504–08; GWPD Suppl. Case Report of Dec. 16, 2014, Pl.'s Ex. 10, at AA0000509–12.[17] Slifka told plaintiff that OSRR no longer had a role in the matter because VT was no longer a student at the University and her point of contact was now GWPD. Email of Dec. 5, 2014 from Slifka to Pl., Pl.'s Ex. 118, at AA0010781–82.

> I encourage you to continue to communicate with GWPD about [VT's] behavior. I am aware that Ms. Suz Combs of GWPD has been in the process of trying to reach you to obtain further information and documentation in relation to violations of the No Contact Order.

*Id.* (providing plaintiff with contact information for Suzanne Combs, Captain Mark Balazik, and Captain Michael Glaubach).

---

17     VT continued to harass University personnel during this time as well. *See* OSRR Admin. Action /Additional Correspondence, Entry of Nov. 11, 2014, Pl.'s Ex. 15, at AA0001170 (noting that OSRR filed GWPD incident report about harassing telephone calls from VT).

Captain Mark Balazik explained the situation to Combs in an email:

> [S]he is still our student but he is not and he now lives out of state. I understand that Ms. Prasad has been reluctant to involve the Court. If she continues to demand service without taking advantage of the resources that you have offered to facilitate for her, let me know and we will deal with her and her mother.

Email of Dec. 6, 2014 from Balazik to Combs, Pl.'s Ex. 118, at AA0010781. Internal GWPD email at this time showed that Interim Chief Demes offered to talk to VT even though he was no longer a student "to try to talk some sense into his head," but Captain Balazik recommended that Demes "refrain" and "that ship has sailed," stating that VT was a former student who was "quite unstable." Email of Dec. 7, 2014, Pl.'s Ex. 118, at AA0010780. Captain Glaubach suggested that the school should rescind his degree. *Id.*

In late December 2014, plaintiff filed a police report in Florida complaining of VT's online stalking and cyber-harassment. Sarasota Cty. Sheriff's Office Report of Dec. 22, 2014, Pl.'s Ex. 119, at AA0008137–38 ("In the past three months, Ricca advised, she has received approximately 30 emails and they have caused her considerable anguish and she is afraid he will come to look for her. Ricca stated that none of the communications from the suspect are threatening in any way but he tells her that he loves her then, at a later time, he hates her.").

Plaintiff returned to GW in early 2015 for the final semester of her graduate studies. Def.'s SOP ¶ 70. In January 23, 2015, plaintiff sent an email to a reporter for the University's student newspaper, *The Hatchet*, to inquire whether the newspaper would be interested in writing about her experience "reporting dating violence at GW." Email of Jan. 23, 2015 from Pl. to C. Murphy, Def.'s Ex. 28, at RFP 001302. In the email, plaintiff confirmed that the only assault she had

reported to the GW was the physical attack on March 30, 2013: "I never reported any of the sexual abuse (too ashamed)." *Id.*[18]

In February 2015, plaintiff learned that VT had received his degree from GW. Letter of Jul. 14, 2015 from Prasad to GW, Pl.'s Ex. 28, at RFP 001531.

## IX. Plaintiff Obtained a Civil Protection Order against VT and Graduated in 2015

In late February 2015, plaintiff returned to D.C. Superior Court and petitioned for a Civil Protection Order against VT. Petition for Civil Protection Order, Feb. 27, 2015, Def.'s Ex. 66, at RFP 001325–29 (listing thirteen instances in which VT violated GW's No Contact Order from May 23, 2014 through Feb. 12, 2015). She obtained a temporary order from the court that same day, Temporary Protection Order, Def.'s Ex. 67, at RFP 001330, and the order became permanent on March 12, 2015, effective for one year. *See* Civil Protection Order, Pl.'s Ex. 98, at AA0000477–79. VT did not violate either order, Prasad Dep. at 221:19–222:1, and plaintiff did not renew the order when it expired on March 11, 2016. *Id.* at 222:18–22. She completed her post-graduate studies and received a master's degree in public health from the University in May of 2015. *Id.* at 225:19–21.

## PROCEDURAL HISTORY

Plaintiff initiated this action on October 21, 2015. Compl. [Dkt. # 1]. The complaint included five counts: 1) violations of Title IX, 2) breach of contract, 3) promissory estoppel, 4) negligent infliction of emotional distress, and 5) negligent retention. *Id.* ¶¶ 102–46. Count One alleged that the school knew about VT's sexual harassment of plaintiff and responded in an unreasonable manner that denied her access to the school's educational benefits. *Id.* ¶¶ 102–111.

---

18      The paper ran a series of articles about plaintiff's experience in 2015. Pl.'s SOF ¶ 197.

Count Two alleged that the University had breached the October 2013 Agreement by allowing VT to graduate even though he violated the No Contact Order and that she suffered damages as the third-party beneficiary of the contract. *Id.* ¶¶ 112–22. Count Three alleged that GW promised it would take actions against VT to protect plaintiff but failed to implement the promised protections. *Id.* ¶¶ 123–29. Count Four alleged that GW promised to protect plaintiff and negligently failed to fulfill that promise, causing plaintiff serious emotional distress. *Id.* ¶¶ 130–38. Count Five alleged that GW negligently retained OSRR Director Gabriel Slifka. *Id.* ¶¶ 139–46.

On December 3, 2015, defendant moved to dismiss Counts Two through Five. Def.'s Mot. to Dismiss [Dkt. # 63]. It did not move to dismiss Count One, the Title IX claim. *See id.* The Court granted defendant's motion to dismiss plaintiff's Count Three, the promissory estoppel claim, and denied the motion as to Counts Two, Four, and Five – the contract claim, the claim for negligent infliction of emotional distress, and the claim for negligent retention. *See* Jun. 10, 2016 Hr'g Tr. [Dkt. # 15].

On May 1, 2018, defendant moved for summary judgment on the four remaining counts. Def.'s Mot. for Summ. J.; Def.'s Mem. in Supp. [Dkt. # 63] ("Def.'s Mem."). On May 22, 2018, plaintiff opposed the motion with respect to all counts, and filed a cross-motion for summary judgment on the Title IX, contract, and negligent infliction of emotional distress claims. Pl.'s Cross-Mot. for Summ. J. and in Opp. to Def.'s Mot. for Summ. J. [Dkt. # 81] ("Pl.'s Opp."). Defendant filed a reply and cross-opposition on June 11, 2018, Reply Mem. in Supp. of Def.'s Mot. for Summ. J. and Opp. to Pl.'s Cross-Mot. [Dkt. # 86] ("Def.'s Reply"), and plaintiff filed a cross-reply on June 25, 2018. Cross-Reply in Supp. of Pl.'s Cross-Mot. for Summ. J. [Dkt # 89] ("Pl.'s Reply"). On December 11, 2018, the Court heard oral argument on the cross-motions. Min. Entry (Dec. 11, 2018).

## STANDARD OF REVIEW

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotation marks omitted). To defeat summary judgment, the non-moving party must "designate specific facts showing that there is a genuine issue for trial." *Id.* at 324 (internal quotation marks omitted).

The mere existence of a factual dispute is insufficient to preclude summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). A dispute is "genuine" only if a reasonable fact-finder could find for the non-moving party; a fact is "material" only if it is capable of affecting the outcome of the litigation. *Id.* at 248; *Laningham v. U.S. Navy*, 813 F.2d 1236, 1241 (D.C. Cir. 1987). In assessing a party's motion, the court must "view the facts and draw reasonable inferences 'in the light most favorable to the party opposing the summary judgment motion.'" *Scott v. Harris*, 550 U.S. 372, 378 (2007) (alterations omitted), quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962) (per curiam).

"The rule governing cross-motions for summary judgment . . . is that neither party waives the right to a full trial on the merits by filing its own motion; each side concedes that no material facts are at issue only for the purposes of its own motion." *Sherwood v. Wash. Post*, 871 F.2d 1144, 1147 n.4 (D.C. Cir. 1989) (alteration in original), quoting *McKenzie v. Sawyer*, 684 F.2d 62, 68 n.3 (D.C. Cir. 1982). In assessing each party's motion, "[a]ll underlying facts and inferences

are analyzed in the light most favorable to the non-moving party." *N.S. ex rel. Stein v. District of Columbia*, 709 F. Supp. 2d 57, 65 (D.D.C. 2010), citing *Anderson*, 477 U.S. at 247.

## ANALYSIS

I.    **Plaintiff's Claim under Title IX Fails Because the University's Response to the Sexual Harassment was Not Clearly Unreasonable**

In Count I, plaintiff asserts that defendant violated Title IX of the Education Amendments of 1972 ("Title IX"). Title IX provides that "[n]o person . . . shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a).[19] The statute covers sexual harassment of one student by another, but the Supreme Court has held that Title IX authorizes damage awards in private lawsuits against educational institutions

> only where they are deliberately indifferent to sexual harassment, of which they have actual knowledge, that is so severe, pervasive, and objectively offensive that it can be said to deprive the victims of access to the educational opportunities or benefits provided by the school.

*Davis Next Friend LaShonda D. v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 650 (1999).

Both parties have moved for summary judgment on this count. Defendant argues that it did not have the actual knowledge of sexual harassment that would have given rise to obligations under Title IX because plaintiff never reported sexual misconduct by VT to the University, Def.'s Mem. at 23–24; that plaintiff cannot show deliberate indifference on the part of the school, *id*. at 24–29; and that plaintiff cannot show she was deprived of educational benefits. *Id*. at 29–30. Plaintiff maintains that she is entitled to judgment on this count because she was subjected to

---

19    GW does not dispute that it is covered by Title IX. *See* Compl. ¶ 105; Answer [Dkt. # 16] ¶ 105 (admitting that it is an educational institution receiving federal funds).

harassment that is actionable under Title IX, Pl.'s Opp. at 7–12; GW had actual knowledge of the harassment and was deliberately indifferent to it, *id*. at 12–22; and this impeded her access to an educational opportunity or benefit offered by the University. *Id*. at 22–24. The Court disagrees with the school's suggestion that it was never under a Title IX obligation in this case, but it will grant summary judgment in favor of the University on this count because its response to the information of which it was aware at any particular relevant point in time was not "clearly unreasonable in light of the known circumstances." *Davis*, 526 U.S. at 648.

### A. The University had actual knowledge of the sexual nature of VT's harassment of the plaintiff.

Defendant argues that the case falls outside of Title IX because plaintiff has produced no evidence that GW "had knowledge that she had ever claimed to be the victim of sexual misconduct." Def.'s Mem. at 23. It emphasizes that plaintiff did not inform the school that she had previously been sexually assaulted at the time she reported the March 2013 attack, and it points out that she specifically prohibited the one official in whom she did confide in 2013 about past sexual assaults from reporting them or otherwise disseminating the information. *Id.* at 23–24. Indeed, plaintiff acknowledged this in her own account of her interactions with the school. Email of Jan. 23, 2015 from Pl. to C. Murphy, Def.'s Ex. 28, at RFP 001302 ("I never reported any of the sexual abuse (too ashamed).").

In her opposition and cross-motion, plaintiff directs the Court's attention to the accumulation of profane and sexually explicit messages from VT that she provided to the school in early 2012, and to GWPD's characterization of the March 2013 attack as "domestic violence." Pl.'s Opp. at 12–15. She also insists that her August 2013 report to Suzanne Combs, GWPD Coordinator of Victims' Services, that VT had sexually assaulted her five times in 2011, supplies

evidence that the school was on notice that his actions were sexual in nature, and that all of those circumstances triggered GW's obligations to her under Title IX. *Id.* at 7–11.

In response, GW characterizes VT's messages as "mere jealousy, possessiveness, or anger about a sexual partner's infidelity," and it asserts that plaintiff cannot use the communication to show that the school knew VT was animated by hostility on the basis of her sex. Def.'s Reply at 6, citing *Wolfe v. Fayetteville, Ark. Sch. Dist.*, 648 F.3d 860, 867 (8th Cir. 2011) ("[A]cts of name-calling do not amount to sex-based harassment, even if the words used are gender-specific, unless the underlying motivation for the harassment is hostility toward the person's gender."). GW also maintains that plaintiff's failure to label the March 2013 altercation as a sexual assault means that its Title IX obligations were not implicated. *Id.* at 7–8.

"Whether gender-oriented conduct is harassment depends on a constellation of surrounding circumstances, expectations, and relationships." *Davis*, 526 U.S. at 631, citing *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 82 (1998) (Title VII case). And it does not need to involve rape or sexual intercourse to be found to be severe, pervasive, and objectively offensive. In *Davis*, the Supreme Court found allegations that a classmate attempted to touch a fellow student's breasts and genital area, made vulgar statements, and engaged in sexually suggestive behavior towards her over a period of months satisfied the requirement that the sexual harassment be "severe, pervasive, and objectively offensive." *Davis*, 526 U.S. at 653. The D.C. Circuit has not applied *Davis* in a case involving student-on-student harassment, but a court in this district recently ruled that "name-calling" in connection with other behavior can rise to the level of sexual harassment given the context. *See Cavalier v. Catholic Univ. of Am.*, 306 F. Supp. 3d 9, 33–34 (D.D.C. 2018), citing *Doe v. East Haven Bd. of Educ.*, 200 Fed. Appx. 46, 48 (2d Cir. 2006) ("Any

doubt that the interaction was defined by Cavalier's sex . . . is firmly answered by her allegation that Doe's friends called her a 'slut' and 'whore' after the alleged assault.").

While the Court does not conclude here that the alleged sexual assaults that went unreported gave rise to statutory obligations, and it need not reach the question of whether those that were reported years later with the proviso that they remain confidential triggered a legal duty, it does find that defendant is not entitled to summary judgment on the grounds that it was unaware of the sexual nature of VT's ongoing harassment and abuse. Plaintiff has presented ample evidence that would enable a rational juror could find that she was subjected to "severe, pervasive, and objectively offensive" sexual harassment, and that the school had actual knowledge of his conduct. *See, e.g.*, Incident Report of Jan. 17, 2012, Pl.'s Ex. 6, at AA0000601–624 (forwarding sexually threatening emails that VT had sent to plaintiff and her friends from London); Email of Apr. 24, 2013 from Pl. to Slifka, Pl.'s Ex. 26, at AA0000765–68 (forwarding screen shots of sexually harassing messages from VT to plaintiff); Email of May 3, 2013 from Pl. to Slifka, Pl.'s Ex. 7, at AA0000579–81 (forwarding sexually harassing emails from VT to plaintiff); *see also* Emails of Apr. 1, 2013 among Esquivel, Lico, Goretsky, Miller, and Slifka, Pl.'s Ex. 47, at AA0010492–3 (stating that Lico was going to contact Deputy Title IX Coordinator Pereira given "that there may be a sexual assault history here").

The avalanche of sexually explicit insults and threats in this case is easily distinguished from the "mere name-calling" described in the *Davis* opinion, and defendant's somewhat dismissive characterization of the multitude of disturbing communications cannot be squared with the tone and content of the communications themselves. Viewing this evidence in the light most favorable to plaintiff, the Court finds that a rational trier of fact could decide that VT's intimidating and demeaning communications, the stalking, and the assaultive behavior were all motivated by

hostility towards plaintiff's gender, that the harassment was severe, pervasive, and objectively offensive, and that the University knew about it, giving rise to obligations under Title IX.

But this does not end the inquiry.

**B.      The University was not deliberately indifferent to VT's sexual harassment.**

To be liable under Title IX, the University must have responded to the harassment plaintiff faced with deliberate indifference.  Schools "are deemed 'deliberately indifferent' to acts of student-on-student harassment only where [their] response to the harassment or lack thereof is clearly unreasonable in light of the known circumstances." *Davis*, 526 U.S. at 648.  "This is not a mere 'reasonableness' standard," *id*. at 649, but a "high standard" that imposes liability only when a school's own deliberate indifference effectively "caused the discrimination."  *Id*. at 642–43 (internal edits omitted); *see also Stiles ex rel. D.S. v. Grainger Cty., Tenn.*, 819 F.3d 834, 848 (6th Cir. 2016) (holding that *Davis'* deliberate indifference standard "sets a high bar for plaintiffs to recover under Title IX").  Schools are not required to "purg[e] their schools of actionable peer harassment," *Davis*, 526 U.S. at 648, and the standard "is sufficiently flexible to account both for the level of disciplinary authority available to the school and for the potential liability arising from certain forms of disciplinary action."  *Id.* at 649 (recognizing that a "university might not . . . exercise the same degree of control over its students that a grade school would enjoy").  The Court holds that plaintiff cannot show that GW's response to VT's harassment was clearly unreasonable in light of all of the known circumstances, *see id.* at 648–49, given the unique and particularly difficult set of circumstances with which it was presented, the support it consistently offered to the not-always-receptive plaintiff, and the prompt actions it took in response to plaintiff's reports.

Plaintiff tends to talk about her time at GW in its entirety, but in the analysis of deliberate indifference below, the Court finds it appropriate to assess the school's conduct based on the circumstances that pertained to each critical juncture.

1.    **GW's response to VT's harassing emails from London in 2012 was not clearly unreasonable.**

Title IX was not implicated in this case in any way until plaintiff brought VT's conduct to the University's attention in 2012. Once that happened, the school responded in an appropriate and timely fashion.

The University imposed the first NCO within a week of plaintiff's January 17, 2012 report that she was receiving harassing messages from VT while he was studying in London, NCO of Jan. 25, 2012, Pl.'s Ex. 6, at AA0000598, and she was given GWPD's emergency and Victims' Services contact information twice. *See* Email of Feb. 7, 2012 from Engle to Pl., Def.'s Ex. 81, at AA0009393; Email of Mar. 19, 2012 from Engle to Pl., Def.'s Ex. 82, at AA0009391. Plaintiff never followed up with the Victims' Services Coordinator, nor did she ever complain that VT violated the order. Rather, she asked the school to rescind it. Email of Oct. 18, 2012 from Pl. to McConnell, Def.'s Ex. 16, at AA0010276; OSRR Admin. Action /Additional Correspondence, Def.'s Ex. 19, at AA0000585 (showing the school rescinded the first NCO on January 3, 2013 "per the request of Ms. Prasad").

Plaintiff maintains that GW's response to her concerns was insufficient. Pl.'s Reply at 14–17. But the undisputed facts reveal that GW had no reason to believe the 2012 NCO was ineffective or that plaintiff continued to experience harassment after it was imposed or lifted. While the record shows VT violated the order and that plaintiff may not have welcomed all of his communications during this time, Pl.'s SODF ¶ 11, there is no evidence that she ever reported his

violations to GW, and there is evidence that she resumed consensual communications while the NCO was in place. *Id.* ("Ms. Prasad does not dispute that on August 26, 2012 she emailed VT to ask him where he was, or that she met with him later that day near the GW campus."). And there is no dispute that she was the one who asked the school to rescind the NCO in October 2012. Pl.'s SOF ¶ 50. Accordingly, the Court finds that GW was not deliberately indifferent to plaintiff's needs between January 24, 2012 and October 2012, when she asked the school to lift the No Contact Order, and that GW had no reason to believe plaintiff required Title IX resources between the time she asked the school to lift the NCO and when she reported the physical assault to the school on April 1, 2013.[20] Thus, the assault did not occur at a time when plaintiff's needs were being ignored, and nothing that happened during that time period is actionable under the statute.

### 2. GW's response after the assault was not clearly unreasonable.

Plaintiff suggests that the school's response after she reported the assault should be seen as further proof of its deliberate indifference. Pl.'s Opp. at 17–19, citing *Vance v. Spencer Cty Pub. Sch. Dist.*, 231 F.3d 253, 261 (6th Cir. 2000) (holding that when a school "has actual knowledge that its efforts to remediate are ineffective, and it continues to use those same methods to no avail," it fails to act reasonably in light of the known circumstances). She argues that GW used remedies against VT that it knew would be ineffective. Pl.'s Opp. at 16–17. Comparing the October 2013 Agreement to the June 4, 2013 letter notifying VT of his suspension after the disciplinary hearing, she asserts that because the June letter failed to stop VT's abuse and the October 2013 Agreement was "nearly identical" to the earlier letter, GW "knew that writing to VT

---

20 ████████████████████████████████████████████████████
████████████████████████████████████████████████████████

yet again . . . would be futile and pointless." Pl.'s Opp. at 17–18, citing Pl.'s Exs. 94 and 26. She also complains that the school's warnings to VT before the May 21 disciplinary hearing were "listless." Pl.'s Opp. at 18.

But "[t]he test for whether a school should be liable under Title IX for student-on-student harassment is not one of effectiveness by hindsight." *Porto v. Town of Tewksbury*, 488 F.3d 67, 74 (1st Cir. 2007); *see also Stiles*, 819 F.3d at 849–50 (distinguishing *Vance*, where the school had only utilized a known "ineffective practice of 'talking to the offenders' without imposing any discipline"). In this case, the school took decisive disciplinary action to separate VT from the campus as soon as plaintiff was finally willing to authorize it to go forward.

When plaintiff reported on April 1, 2013 that she had been assaulted, she made it clear that she did "not wish to take any further action at this time." GWPD Incident Report of Apr. 1, 2013, Pl.'s Ex. 7, at AA0000578. However, GW imposed a No Contact Order the same day. Apr. 1, 2013 No Contact Order, Pl.'s Ex. 7, at AA0000571–72. Also, GW's Deputy Title IX Coordinator at the time, Tara Pereira, met with plaintiff immediately to determine whether she needed Title IX services after the assault. *See* Email of Apr. 1, 2013 from Lico to Esquivel, Pl.'s Ex. 47, at AA0010492 (stating that Lico would contact Deputy Title IX Coordinator Pereira); Pereira Dep. at 111:4–112:18; Combs Dep. at 34:3–35:5.[21] Plaintiff characterizes Pereira's conclusion that plaintiff did not present Title IX concerns at that time as evidence of GW's deliberate indifference. Pl.'s Opp. at 20–22, citing Pl.'s SOF ¶¶ 99–119. But the evidence suggests that the school was

---

21    Plaintiff emphasizes that there is no record of this meeting in OSRR's files, Pl.'s SOF ¶ 100, and disputes that it occurred, Pl.'s SODF ¶ 27, but she has not come forward with evidence to give rise to a genuine dispute of material fact that the meeting took place. *See* Dec. 11, 2018 Hr'g Tr. at 15–16 (stating plaintiff does not recall the meeting but she does not assert that Pereira lied in deposition).

alert to potential Title IX obligations since it had its Deputy Title IX Coordinator meet with plaintiff that day, "[e]ven though she didn't file a report about [sexual assault]." Email of Apr. 1, 2013 from Lico to Esquivel, Pl.'s Ex. 47, at AA0010492. Given that discovery uncovered no further facts about what transpired at this meeting, there is no basis for this Court – or a jury – to second guess Pereira's determination. *See Burwell v. Pekin Cmty. High Sch. Dist. 303*, 213 F. Supp. 2d 917, 934 (C.D. Ill. 2002) ("Plaintiff is essentially asking this court to 'second guess' the school administrators' decisions. That is not this court's role."); *Davis*, 526 U.S. at 648 (holding that courts should not second guess the disciplinary decisions that school administrators make).

The day that plaintiff reported that VT had appeared outside at her window in the middle of the night, April 24, 2013, Slifka notified GWPD and personally warned VT to stop violating the No Contact Order. Email of Apr. 24, 2013 from Slifka to Glaubach, Pl.'s Ex. 56, at AA0010471; Email of Apr. 24, 2013 from Slifka to VT, Pl.'s Ex. 43, at AA0001262. Plaintiff complains that Slifka did not respond to her April 24 email directly until May 3, Pl.'s SOF ¶ 81, but the record shows that he was not ignoring the new development even if he did not get back to plaintiff herself immediately. At that time, there was no reason for Slifka to assume that his warning to VT would go unheeded, because GW had never been informed that VT had violated the first NCO, and this was the first time plaintiff complained that VT was violating the second one. Email of Apr. 24, 2013 from Pl. to Slifka, Pl.'s Ex. 26, at AA0000765 (telling Slifka that she wanted to give him "an honest update" about her ongoing communications with VT during this time "because I now feel harassed").

After plaintiff formally identified VT on April 25, 2013, the school took decisive action: on May 10, GW charged VT; on May 21, it held a disciplinary hearing and suspended him; and

by June 20, it denied his appeal. Pl.'s SOF ¶¶ 101–02, 117. And in the interim, on May 14, GWPD's Victims' Services Coordinator Suzanne Combs gave plaintiff information about how to obtain a Temporary / Certified Protection Order that could be enforceable in court, which plaintiff did not pursue. *See* Email of May 14, 2013 from Combs to Pl., Pl.'s Ex. 79, at ID 000137; Combs Dep. at 66:5–17; 69:2–20.

Plaintiff complains now that the May 21 hearing should have taken place sooner, but at the time, she thanked Slifka for the school's handling of the matter. Email of May 13, 2013 from Pl. to Slifka, Def.'s Ex. 49, at AA0009306–07 ("I am glad GW has taken the situation between [VT] and me seriously, listened to my complaints, and included my input in the decision-making process. . . . Overall, I do feel like I am leaving this university with the situation having been addressed, so thank you."). Furthermore, the period of less than a month between her April 24 formal identification of VT to convening the May 21 disciplinary hearing was not an unreasonable delay. *See Roskin-Frazee v. Columbia Univ.*, No. 17 CIV. 2032, 2018 WL 6523721, at *10 (S.D.N.Y. Nov. 26, 2018) (holding that less than a month between the plaintiff's consent to an investigation of a sexual assault to when the defendant officially opened the investigation without more is not clearly unreasonable).[22] The undisputed facts show that the school credited the

_____

22    Plaintiff also suggests that defendant deliberately scheduled the hearing on a date it knew she would be out of town. Pl.'s SODF ¶ 44, citing Prasad Dep. at 134:3–10. But nothing in plaintiff's emails about scheduling indicate she wanted to appear at the hearing in person. *See* Emails of May 13 & 15, 2013, Pl.'s Ex. 65, at AA0009295–96 (conveying her availability and asking whether she would be able to hear the entire proceeding if she appeared by phone). Furthermore, plaintiff has testified that appearing by phone did not compromise her ability to tell the hearing officer everything she wanted him to know. Prasad Dep. at 133:12–135:9.

statement plaintiff provided at the hearing; it suspended VT as a sanction for the assault; and after that, plaintiff never saw VT on campus again. Prasad Dep. at 149:3–12.[23]

In sum, plaintiff's arguments ignore the fact that the school suspended VT promptly after she formally identified VT as her assailant, ignores the evidence that plaintiff's own actions repeatedly undermined the school's efforts to protect her, and ignores the fact that plaintiff initially refused to pursue other remedies available to her, namely a civil protection order.

### 3.    GW's response after VT was suspended was not clearly unreasonable.

Plaintiff also faults the school for its handling of VT after it ordered his suspension. The evidence shows that VT continued to contact and harass plaintiff in violation of the NCO, and plaintiff describes the school's attempts to stop him from communicating with her as inadequate. But the evidence also establishes that she repeatedly declined to seek a civil protection order, and that she opened the door to VT's renewed communications with her.

In July 2013, after plaintiff had left campus for the summer and VT had left for good, plaintiff informed the school that VT was still communicating with her. In response, GW issued an order that VT would be arrested if he was found on University property. Interdepartmental Mem. of Jul. 29, 2013, Pl.'s Ex. 81, at AA0001115. Combs again gave plaintiff information about how to obtain a Civil Protection Order, which would give plaintiff broader protection, and plaintiff again failed to pursue that option. *See* Email of Jul. 23, 2013 from Combs to Pl., Pl.'s Ex. 79, at ID 000138; *see also* Email of Jul. 29, 2013 from Pl. to Combs, Pl.'s Ex. 79, at ID000139 ("I don't really care about the protection order."). She subsequently reported additional violations of the

---

23    Plaintiff saw VT in person once after his suspension, in 2015, when she appeared at D.C. Superior Court in connection with obtaining the February 27, 2015 Civil Protection Order. Prasad Dep. at 148:5–13.

NCO, but she repeatedly told Combs that she was not looking to take action. Email of Jan. 24, 2014 from Pl. to Combs, Pl.'s Ex. 100, at AA0007828.

Plaintiff identifies Combs' failure to provide her with Title IX resources in August of 2013 – when plaintiff first revealed the sexual assaults that had taken place two years earlier – as a key instance of GW's failure to fulfill its statutory responsibilities and a basis for the issuance of judgment in her favor. In assessing this contention, the Court notes at the outset that plaintiff told Combs she could not disseminate the information, and honoring plaintiff's wishes to keep the students' prior history confidential can hardly constitute deliberate indifference. *See Roe v. St. Louis Univ.*, 746 F.3d 874, 883 (8th Cir. 2014) (ruling that a university was not deliberately indifferent to student's sexual assault because "[d]espite being informed of resources available to help her, Roe declined to report her rape or her assailant and told [school personnel] she did not want the university to inform her parents about it."). Also, there is conflicting evidence on the question of whether Combs told plaintiff about GW's Title IX resources at that time or not. *Compare* Combs Dep. at 303:4–305:21 (stating she told plaintiff about the University's Title IX resources at the meeting when plaintiff reported the assaults) *with* Prasad Dep. at 278:13–281:16 (testifying that she never individually received Title IX information until late spring 2015). But the Court holds that this dispute of fact is immaterial: even if plaintiff is correct that she was not specifically directed to Title IX resources in a meeting with a GW counselor until 2015, the undisputed evidence shows that GW's response to VT's harassment during this time was not clearly unreasonable.

First, there is no basis to believe that providing plaintiff with Title IX resources in particular would have changed VT's behavior. Indeed, her only suggestion is that it would have changed *her* behavior. "[H]ad Miss Prasad been referred to the Title IX office in the first place *it is quite*

*possible* that she could have turned to them and to counseling to help navigate the situation that she found herself in." Dec. 11, 2018 Hr'g Tr. at 7, 14 (emphasis added). But as counsel's choice of language reflects, this is entirely speculative, particularly given that plaintiff received counseling and therapy throughout much of her time at GW. *See* Pl.'s SOF ¶¶ 33, 43, 74, 158–59, 161, 167, 171, 179; Pl.'s SODF ¶ 73; Prasad Dep. at 242:8–246:3. The assertion also assumes that plaintiff would have been willing to work with a Title IX counselor – an assumption that is undermined by her insistence that Combs not report or otherwise share the information about the earlier sexual assaults. *See also* Email of Jan. 23, 2015 from Pl. to C. Murphy, Def.'s Ex. 28, at RFP 001302 (acknowledging that she never reported sexual assaults to the school).[24]

Furthermore, the record shows that the school used the limited tools available to it after VT left campus to try to enforce the NCO. After June 2013, VT was no longer on campus; he was either suspended or, by June 2014, a former student. His harassment of plaintiff during this time consisted of sending her gifts and messages, primarily through non-GW platforms. *See, e.g.*, GWPD Incident Report of Jul. 22, 2013, Pl.'s Ex. 8, at AA0001514–25 (reporting calls and Linkedin messages, emails sent from VT's gmail.com account); GWPD Incident Report of Nov. 14, 2014, Pl.'s Ex. 10, at AA000495–96 (same).

---

24    The notion that involving a Title IX counselor in particular would have altered the pattern of re-establishing contact with VT is pure speculation. Indeed, plaintiff's suggestion that any lay juror would have intuited that plaintiff's ambivalent behavior was consistent with her being a victim of abuse, *see* Dec. 11, 2018 Hr'g Tr. at 57, is inconsistent with her arguments that no one besides a specifically designated Title IX counselor was qualified to counsel her and take those issues into account, and that the referral to a Title IX counselor was such a significant omission that it rendered all of the University's other efforts to be inadequate. *See id.* at 54–56. The record shows that GW offered plaintiff an array of resources, including access to trained therapists, Pl.'s SOF ¶¶ 33, 43, 74, 158, and so it cannot be characterized as "indifferent" as that term has been defined by the courts.

Title IX "confines the scope of prohibited conduct based on the recipient's degree of control over the harasser and the environment in which the harassment occurs," *Davis*, 526 U.S. at 644, and courts must consider a school's "disciplinary authority" over a harasser in analyzing deliberate indifference. *Id.* at 647; *see Nungesser v. Columbia Univ.*, 244 F. Supp. 3d 345, 367–68 (S.D.N.Y. 2017), *appeal withdrawn*, No. 17-900, 2017 WL 4404575 (2d Cir. Jul. 10, 2017) (declining to impose Title IX liability where university did not "exercise control over postings made on Facebook, Twitter, or Tumblr, on which the majority of the threats [we]re alleged to have been posted").

To be sure, the fact that a student uses electronic platforms outside the auspices of a school's computer system does not necessarily insulate a school from liability for harassment under Title IX. In *Feminist Majority Found. v. Hurley*, 911 F.3d 674, 688–89 (4th Cir. 2018), the Fourth Circuit held that a university could not "turn a blind eye to the sexual harassment that pervaded and disrupted its campus solely because the offending conduct took place through cyberspace." But this is not a case of a school turning a blind eye. The University told VT to stop violating the NCO, and it dangled the carrot of letting him earn his degree after his suspension, if he complied with the NCO and met other conditions. *See* Oct. 2013 Agreement, Def.'s Ex. 61, at AA0001501–02. When that failed, the University reinstated his suspension. Letter of Mar. 19,

2014, Def.'s Ex. 73, at AA0011566–68. ███████████████████

███████████████████████████████████████.[25]

The deliberate indifference standard "is sufficiently flexible to account both for the level of disciplinary authority available to the school and for the potential liability arising from certain forms of disciplinary action." *Davis*, 526 U.S. at 649. The University sought to prevent VT's ongoing harassment of plaintiff (and its own staff) by using the disciplinary tools available to it, and encouraging plaintiff to secure protections available to her. Its ultimate inability to enforce the NCO against VT and its decision to settle potential claims against it by VT do not demonstrate deliberate indifference. The standard does not impose Title IX liability based on hindsight but only when the school's actions or inactions in effect "cause[d] the discrimination." *Id*. at 642–43; *cf. Vance*, 231 F.3d at 261–63 (holding school liable for only warning offenders without imposing any discipline).

Here, the University did discipline VT, but after it suspended him, its options for controlling his behavior were greatly reduced. Moreover, the school's efforts were often compromised or undermined by plaintiff's own behavior. The record shows that even after VT had been suspended for assaulting her, plaintiff opened the door to further communications while the NCO was in place, Prasad Dep. at 190:16–191:11, 192:9–16, 148:14–149:2 (unblocking him on Facebook or calling to express condolences about a friend of his), and she refused to press

_____

[25] Plaintiff also argues that GW's "leniency toward VT" establishes its deliberate indifference, comparing the sanctions that were recommended for the threatening emails he sent from London and those recommended after the assault with the sanctions he received for them. Pl.'s Opp. at 19–20. But Title IX does not require administrators to "engage in particular disciplinary action." *Davis*, 526 U.S. at 648; *Johnson v. Indep. Sch. Dist. No. 47*, 194 F. Supp. 2d 939, 948 (D. Minn. 2002) ("[T]he deliberate indifference standard does not give aggrieved parties a right to particular remedial demands.").

charges or avail herself of other remedies. *See, e.g.*, GWPD Incident Report of Jan. 24, 2014, Def.'s Ex. 9, at AA0001471–75 (stating she was "not looking to take action"). When she finally obtained a Civil Protection Order in February 2015, as GWPD's Victims' Services Coordinator Combs had encouraged her to do for years, it worked.[26]

The Court holds that GW's efforts to thwart an unstable, aggressive, and persistent harasser do not meet the high standard for deliberate indifference. There is no question that VT's actions towards plaintiff and GW staff were abhorrent and that plaintiff has suffered as a result of his manipulation and unhinged behavior. But this is simply not a case where a school ignored her plight or "made no effort whatsoever." *C.R.K. v. U.S.D. 260*, 176 F. Supp. 2d 1145, 1167 (D. Kan. 2001), *quoting Davis,* 526 U.S. at 654; *Vance*, 231 F.3d at 262 (with the exception of "talking to" offending students there was no evidence the school took any other action); *Murrell v. Sch. Dist. No. 1, Denver, Colo.*, 186 F.3d 1238, 1248–49 (10th Cir. 1999) (school never informed law enforcement, investigated claims, nor disciplined the offender). GW promptly imposed No Contact Orders after plaintiff brought VT's actions to its attention, and it suspended him in short order after plaintiff identified him as her assailant. When VT continued to violate the second NCO, the school told plaintiff how to obtain a Civil Protection Order since he was no longer at GW. And the evidence indicates the school had its Deputy Title IX Coordinator meet with plaintiff after the assault. This, coupled with the evidence on the record that the University provided all students with information about where to go and what to do if they become victims of sexual misconduct – through University-wide emails, newsletters, and a website, *see* footnote 6 *supra* – and plaintiff's

---

26    Plaintiff did obtain a Temporary Protection Order after she returned to campus in the fall of 2013, which expired on November 5, 2013, but she did not seek a permanent order at that time. *See* Pl.'s SOF ¶¶ 136, 143.

admission that she received or had access to it all, Prasad Dep. at 201:2–19, 204:2–12, leads the

Court to conclude as a matter of law that defendant's response here was not clearly unreasonable.

*Davis*, 526 U.S. at 649 ("In an appropriate case, there is no reason why courts, on a motion . . .

for summary judgment, . . . could not identify a response as not 'clearly unreasonable' as a matter

of law.").[27]

## II. Plaintiff's Breach of Contract Claim Fails Because the October 2013 Agreement Cannot be Enforced against the University

Plaintiff argues that she was an intended third-party beneficiary of the October 2013

Agreement between GW and VT, and that GW breached that agreement by giving VT his degree

despite his failure to comply with its terms. Pl.'s Opp. at 25–31; Oct. 2013 Agreement, Def.'s Ex.

61, at AA0001501–02. GW moves for summary judgment on this count on the grounds that the

agreement which forms the basis for Count Two was rescinded. Def.'s Mem. at 30–31. It also

---

[27] Given this ruling, the Court need not reach the issue of whether plaintiff was deprived of any educational opportunities or benefits. GW notes that plaintiff excelled academically, Def.'s Mem. at 29, completing her undergraduate study in three years and earning a master's degree in two years, both with highest honors. Pl.'s SOF ¶ 1; Pl.'s Ex. 1. But this is largely a testament to her own perseverance and commitment, and the Court is not persuaded that plaintiff's case necessarily fails because she was successful academically. The more relevant point is that plaintiff came forward with very little *evidence* that her education was interrupted or compromised. There was some testimony in her deposition that she missed some classes in the spring of 2013, and she attributes those occurrences to mental health issues. Prasad Dep. at 226:18–227:4. Also, counsel stated at the hearing that over time, plaintiff became less involved in extracurricular activities than she had been at the start of her college career. Dec. 18, 2018 Hr'g Tr. at 45–46. But plaintiff did not introduce records of any hospitalization or ongoing treatment that led to, for example, prolonged absences, incompletes, or temporary withdrawal from school for any period of time. The only other possible educational deprivation plaintiff identified was the fact that she decided to complete the fall 2014 semester of the second year of her master's program from Florida instead of staying on campus. But by that point, VT was no longer a GW student, and plaintiff did return in the spring. Thus, to the extent this is a separate element of a Title IX claim, the evidence is weak, and it does not undermine the conclusion that judgment should be entered in favor of the defendant.

contends that plaintiff was not an intended third-party beneficiary of the agreement, and it submits that even if she was, GW was the promisee, and not the promisor in the contract, so no enforcement action can be brought against it. *Id.* at 31–35; Def.'s Reply at 22–28.

The record reflects that the October 2013 Agreement between VT and the school was indeed rescinded by GW on March 19, 2014. *See* Letter of Mar. 19, 2014, Def.'s Ex. 73, at AA0011568 ("The university has withdrawn its consent to awarding your degree and the Office of Student Rights & Responsibilities is proceeding in accordance with the terms of the June 4, 2013 letter . . . because of your failure to meet academic and other conditions described in the October 29, 2013 Agreement."). ██████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████ Def.'s Mem. at 31 n.23.  The Court need not decide this issue, though, because it finds as a matter of law that plaintiff could not enforce either contract against GW since GW was the promisee in the agreement between the institution and VT.

In a letter from GW's Senior Associate Dean of Students to VT, the University offered to award VT a degree notwithstanding his disciplinary problems, contingent upon VT's successful completion of his academic and financial prerequisites and his compliance with five conditions:

> First Condition: You must not be named as a subject in any George Washington Police Department incident report at any time in the future.

> Second Condition:  You must remain in compliance with the No Contact Order issued to you on April 1, 2013 for a period of three years from the date of this letter.

> Third Condition:  You must not at any time in the future . . . register for or attend any undergraduate, graduate . . . or other classes at GW . . . .
>
> Fourth Condition: You must not engage in any conduct at any time in the future that violates university policy, including without limitation policies and laws applicable to harassment, cyber bullying, spamming, hacking, or responsible use of technology, nor may you cause or encourage any other person to violate such policies or law on your behalf.
>
> Fifth Condition:  You must comply with all instructions set forth in the barring notice dated August 10, 2013, including without limitation that you may not enter any university property . . . in the District of Columbia and Virginia.  If you are found to be on or in any property owned or leased by the university, you will be trespassing and may be arrested.

Oct. 2013 Agreement, Def.'s Ex. 61, at AA0001501–02 (underlines in original).  VT signed the letter on November 4, 2013, thereby accepting these obligations.  *Id.* at AA0001502 ("I wish to obtain my degree and I accept terms and conditions set forth in this letter.").

By contrast, the language related to GW in the agreement does not enumerate obligations, but it speaks in terms of the University's "rights" in the event of VT's non-compliance.

> Please be advised that, in offering you this path to obtain your degree despite your current disciplinary status, the university is providing you with a unique and significant accommodation. That offer, however, is fully contingent on your completion of the steps and conformity with the conditions set forth in this letter. If at any time you violate any of these conditions prior to being awarded your degree, the university will have the absolute right to withdraw its consent to awarding you that degree and the Office of Student Rights & Responsibilities will have the absolute right to proceed in accordance with the terms of the June 4, 2013 letter from Peter Konwerski, Vice Provost and Dean of Student Affairs. If at any time you violate any of these conditions after you are awarded your degree, the university will have the absolute right to restore your disciplinary record and reinstate the notation of disciplinary suspension on your academic transcript.

Oct. 2013 Agreement at AA0001502.  ████████████████████████████████ .





A third party may sue for breach of contract "if the contracting parties intended the third party to benefit." *District of Columbia v. Campbell*, 580 A.2d 1295, 1302 (D.C. 1990). An individual is an intended third-party beneficiary if the circumstances under which a contract was executed indicate some element of the contract was meant to benefit her. *See A.S. Johnson v. Atl. Masonry Co.*, 693 A.2d 1117, 1122 (D.C. 1997). An intended beneficiary need not be named in the contract, though, *see Hossain v. JMU Props., LLC*, 147 A.3d 816, 820 (D.C. 2016), and intent

may be "express *or* implied." *Fort Lincoln Civic Ass'n, Inc. v. Fort Lincoln New Town Corp.*, 944 A.2d 1055, 1065–66 (D.C. 2018), citing *Alpine Cty., Cal. v. United States*, 417 F.3d 1366, 1368 (Fed. Cir. 2005) (emphasis added).

Plaintiff reasonably maintains that she is an intended third-party beneficiary of the agreements between the school and VT because several of its provisions, in particular, the requirement to comply with the No Contact Order, "'would be meaningless' unless read 'as manifesting an intention to benefit'" her. Pl.'s Opp. at 26, quoting *A.S. Johnson*, 693 A.2d at 1122.[29] But even if this Court were to agree with her assessment of the parties' understanding, it concludes that she cannot sue to enforce the agreement against GW because a third-party beneficiary can only enforce a contract against the party that made the promise to do something in the contract, and the University was not the promisor in either agreement here.

As another court in this district stated in *John D. Neumann Props., Inc. v. Washington Metro. Area Transit Auth.*, No. Civ. A. 86-2013, 1988 WL 9582, at *6 (D.D.C. Jan. 29, 1988), "[i]t is well established that an intended third-party beneficiary can sue the promisor to enforce a contractual covenant. The intended third-party beneficiary cannot, however, sue the promisee for breach of the promisee's contract with the promisor." *See also Campbell*, 580 A. 2d at 1302 ("In the vast majority of cases, the third-party beneficiary's action lies only against the promisor."); Restatement (Second) of Contracts § 304 (1981) ("A promise in a contract creates a duty *in the promisor* to any intended beneficiary to perform the promise . . . .") (emphasis added).

---

29      Plaintiff also argues that she accepted the benefit of the contract because she relied on it when she dropped her Civil Protection Order against VT, giving her a cause of action for a breach of contract claim. Pl.'s Opp. at 28–31.

In *Campbell*, the District entered into an agreement with a general contractor for a public works project. 580 A.2d at 1297. As part of the agreement, the general contractor was required to obtain a payment bond to protect its subcontractors. *Id.* at 1302. When the general contractor failed to do so and then failed to pay a subcontractor the amount it owed him, the subcontractor sued the District as a third-party beneficiary, alleging that the District "breached its contractual duty to insist upon a payment bond." *Id.* (internal quotation marks omitted). The Court of Appeals rejected this approach, holding that the District was not liable to the subcontractor because the general contractor had "clearly" promised the District that it would obtain a payment bond, making the general contractor the promisor and the District the promisee. *Id.* "[W]hile the District as promisee failed to enforce [the general contractor's] promise, as is the case in many third-party claims, this does not change the fact that the promisor, not the promisee, committed the breach." *Id.* at 1303.

Here, the University's original offer was contingent upon VT's performance of two steps and his compliance with a set of conditions. Oct. 2013 Agreement at AA0001501–02. If VT did not complete his academic requirements, or if he violated any of the conditions, the University retained the "absolute right" to withdraw its consent to award him a degree. *See id.* This is exactly what happened and what led to the rescission of the agreement. *See* Letter of Mar. 19, 2014, Def.'s Ex. 73, at AA0011566–68. Thus, VT was the promisor in the October 2013 arrangement, and GW was the promisee, ███████████████████████████████████████████

████████████████████████████████████████████████████████

██ . For this reason, applying the well-established principles set out in *Campbell*, plaintiff cannot bring an action to enforce either contract against GW, and the Court will grant summary judgment in favor of the defendant on Count Two.

### III. Plaintiff's Claim for Negligent Infliction of Emotional Distress Fails Because Plaintiff has Presented No Expert Testimony regarding the Standard of Care

Plaintiff alleges that GW is liable to her for negligent infliction of emotional distress because it owed her a duty to investigate and address VT's harassing behavior, and it breached that duty. Compl. ¶¶ 130–38. She alleges that as a result of GW's failure to fulfill its obligations, she suffered, and continues to suffer, from severe post-traumatic stress disorder, and she states that her unabated concerns for her life and safety have required her to seek mental health counseling and medical treatment. Compl. ¶¶ 135–36. Defendant has moved for summary judgment on this count on several grounds, arguing that: plaintiff cannot establish the existence of the special relationship needed to support a negligent infliction of emotional distress claim;[30] plaintiff did not proffer the expert testimony necessary to establish the standard of care that the University owed her as its student; and plaintiff cannot prove that her emotional distress was caused by the University given the evidence of pre-existing psychiatric problems and other traumatic events in her life unrelated to VT. Def.'s Mem. at 35–41. Plaintiff filed a cross-motion for summary judgment, responding that the facts reveal the existence of a special relationship with GW; an expert witness is not required because the nature of the duty defendant undertook as part of that relationship falls within the realm of common knowledge and everyday experience; and there was an especially likely risk that GW's negligence in performing its duty would cause plaintiff serious emotional distress. Pl.'s Opp. at 31–40.

---

[30] There are several theories that can support a claim of negligent infliction of emotional distress, but the Court ruled out two of those alleged in the complaint when it decided defendant's motion to dismiss, *see* Jun. 10, 2016 Hr'g Tr. at 18–25, and plaintiff was only permitted to proceed on the special relationship theory.

A plaintiff may recover for negligent infliction of emotional distress under the "special relationship theory" if she can show that:

> (1) the defendant has a relationship with the plaintiff, or has undertaken an obligation to the plaintiff, of a nature that necessarily implicates the plaintiff's emotional well-being, (2) there is an especially likely risk that the defendant's negligence would cause serious emotional distress to the plaintiff, and (3) negligent actions or omissions of the defendant in breach of that obligation have, in fact, caused serious emotional distress to the plaintiff.

*Hedgepeth v. Whitman Walker Clinic*, 22 A.3d 789, 810–11 (D.C. 2011).

While the Court does not agree with GW's suggestion that as a matter of D.C. law, expert testimony is a necessary component of every negligence case, it will grant summary judgment in favor of defendant in this case because the assistance of an expert was needed to establish the appropriate standard of care for a university faced with the complicated circumstances that unfolded here. It also finds that plaintiff's claim would fail in any event because she has not adduced evidence to establish that GW's alleged negligence was the cause of her emotional distress. Given the problems with these aspects of plaintiff's claim, the Court need not decide whether she has established the existence of the special relationship or undertaking that would be the predicate for a negligent infliction of emotional distress claim.

## A. Expert testimony on the standard of care is required in this case.

Defendant argues that expert testimony on the applicable standard of care is necessary to prove plaintiff's claim for negligent infliction of emotional distress. Def.'s Mem. at 35–36. Plaintiff takes the position that the standard of care the University owed her is the "traditional reasonable person standard, which the jury can ascertain without the aid of expert testimony." Pl.'s Opp. at 38, quoting *Robinson v. Wash. Metro. Area Transit Auth.*, 774 F.3d 33, 39 (D.C. Cir. 2014).

Under D.C. law, a "plaintiff in a negligence action bears the burden of proof on three issues: 'the applicable standard of care, a deviation from that standard by the defendant, and a causal relationship between that deviation and the plaintiff's injury.'" *Toy v. District of Columbia*, 549 A.2d 1, 6 (D.C. 1988), quoting *Meek v. Shepard*, 484 A.2d 579, 581 (D.C. 1984). Expert testimony is not required to establish the deviation from the standard of care if "the alleged negligent act is 'within the realm of common knowledge and everyday experience.'" *Id.*, quoting *District of Columbia v. White*, 442 A.2d 159, 164 (D.C. 1982). However, "a plaintiff is required to put on expert testimony where the subject presented is 'so distinctly related to some science, profession, or occupation as to be beyond the ken of the average layperson.'" *Id.*, quoting *District of Columbia v. Peters*, 527 A.2d 1269, 1273 (D.C. 1987). When the standard of care in question "arises from a particular occupational setting, and depends on knowledge of typical practices by professionals of that occupation, a plaintiff cannot establish a negligence claim . . . without proffering expert testimony as to the standard of care particular to that occupational setting." *Lesesne v. District of Columbia*, 146 F. Supp. 3d 190, 194 (D.D.C. 2015);[31] *see also Edwards v. Okie Dokie, Inc.*, 473 F. Supp. 2d 31, 45 (D.D.C. 2007), citing *District of Columbia v. Freeman*, 477 A.2d 713, 719 (D.C. 1984) ("The jury may evaluate the facts without the aid of expert testimony only if the ultimate issue is within their common knowledge and everyday experience."). These principles apply to claims alleging negligent infliction of emotional distress.

---

[31]  Defendant suggests that *Lesesne* controls the outcome here, but it places too much weight on that opinion. While the Court finds the non-binding district court opinion to be well-reasoned and instructive, the court in that case found expert testimony to be required in the unique context of police custodial interrogation and the proximate causation of medical injuries, and it did not purport to lay down a general rule for negligence claims. 146 F. Supp. 3d at 194–96.

*See Lesesne*, 146 F. Supp. 3d at 197; *Edwards*, 473 F. Supp. 2d at 45–46; *Fletcher v. District of Columbia*, No. 01-0297, 2005 WL 670676, at *6 (D.D.C. Mar. 22, 2005).[32]

"The decision whether to admit or require expert testimony on a particular set of facts is confided to the sound discretion of the trial court," and that discretion is "broad." *Varner v. District of Columbia*, 891 A.2d 260, 266 (D.C. 2006); *District of Columbia v. Davis*, 386 A.2d 1195, 1200 (D.C. 1978). Nonetheless, the D.C. Court of Appeals has required expert testimony to establish the standard of care and its breach in a number of factual scenarios. *See, e.g.*, *District of Columbia v. Arnold & Porter*, 756 A.2d 427, 433–34 (D.C. 2000) ("determin[ing] that expert testimony was required in this matter as to the applicable standard of care" for the operation and maintenance of a municipal water main system); *Clark v. District of Columbia*, 708 A.2d 632, 634–35 (D.C. 1995) (holding that "expert testimony was required" in a case involving the operation of a juvenile detention center, where juvenile in custody committed suicide); *District of Columbia v. Hampton*, 666 A.2d 30, 35–36 (D.C. 1995) (holding that "expert testimony was needed to establish the standard of care" in a case involving the selection and supervision of foster parents, where a child died in foster care as a result of the foster parents' alleged negligence).

---

32     Plaintiff said little in response to defendant's arguments concerning the need for an expert beyond citing *Hedgepeth* and insisting that the scope of the duty was defined by the terms of the special relationship, and that whether it was breached is an issue within the ken of the average juror. Pl.'s Opp. at 31–40. But the *Hedgepeth* opinion does not stand for the proposition that no expert is ever required; the court stated, "[w]hether the defendant breached [its] obligations is to be determined by reference to the specific terms of the undertaking agreed upon by the parties or, otherwise, by an objective standard of reasonableness applicable to the underlying relationship or undertaking." 22 A.3d at 811. Here, even if one were to conclude that GW assumed the responsibility for protecting plaintiff from VT during those time periods when she did not ask it to stand down, there is no clear evidence in the record of "the specific terms of the undertaking agreed upon by the parties," and the University's conduct can only be measured against "an objective standard of reasonableness applicable to the underlying relationship." *Id.*

The relevant standard of care at issue here is that owed by a university to a student who has reported harassment at the hands of another student, so none of these precedents is particularly apt. However, with respect to universities, and in particular, their disciplinary processes, the Court of Appeals has concluded that it fell within the discretion of the trial judge to require expert testimony involving issues of "safety, security and crime prevention" in an academic setting. *Varner*, 891 A.2d at 267.[33] In that case, a college declined to expel a student who had been disciplined for various acts of misconduct, including repeated major thefts, and he subsequently murdered two classmates. The student in question had been suspended for a year, but not expelled, and as the Court of Appeals described it, it was the plaintiffs' contention "that a lay jury [was] entitled to override the University's judicial process and rule that this substantial suspension was inadequate and violated the applicable standard of care." *Id.* at 266.

The court held that "the trial judge did not err or abuse his discretion in holding that, without expert testimony, there was insufficient evidence of negligence to present a jury question." *Id.* at 267. While the court was willing to acknowledge that plaintiff's allegations had some force as a matter of common sense, *id.* at 266, it refrained from overruling the determination below. "The precise question here . . . is whether the trial judge committed reversible error in holding that a lay juror could not be expected to determine whether the result of the University's disciplinary

---

33      *See also Messina v. District of Columbia*, 663 A.2d 535, 538 (D.C. 1995). In that case, the plaintiff sued the District of Columbia for negligence after his daughter fell off the monkey bars at a school playground and broke her arm, and the court held that whether the school district should conform to a particular cushioning standard for a playground was not a subject within the understanding of the average juror. *Id.* at 538. Although the case concerned the requirement for expert testimony in school settings generally, it does not supply much guidance here since it did not involve academic or disciplinary matters, and evolving standards for playground construction are more obviously a matter of expertise beyond the knowledge of the average jury.

process was unreasonable. . . . Although the issue is not an easy one . . . we conclude that the trial judge did not err in [requiring an expert]." *Id.* at 266, 270. "[T]he trial court could reasonably conclude that questions as to the appropriateness and sufficiency of academic discipline should not be left to a lay jury to decide without expert testimony." *Id.* at 267.

After considering all of these principles, the Court concludes that the duty that was alleged to have been breached here is one that necessarily involves the application of professional judgment, and therefore, plaintiff could not carry her burden to establish a breach of duty without the testimony of a witness "who is qualified as an expert by knowledge, skill, experience, training, or education," *see* Fed. R. Evid. 702, to explain what that duty consists of and how the institution's judgment should reasonably have been exercised in these circumstances. While the Court is not announcing a blanket rule that an expert must testify in every case involving an academic institution, it finds in its discretion that plaintiff could not meet her burden to establish the standard of care, or that the standard was breached in this instance, given the absence of any expert guidance on how reputable universities typically address the extremely difficult circumstances with which GW was faced in this case, and how they should balance the multiple – and potentially conflicting – interests of the individuals involved and the layers of statutory and common law obligations running to both the victim and the accused. Indeed, this case appears to present a more ambiguous and thornier situation than the one the trial court wrestled with in *Varner*. *See Varner*, 891 A.2d at 266 ("At first blush, there is arguably some common sense appeal to the Varners' suggestion that the average juror does not require advice from experts from academe in order to be able to identify repeated major thefts as misconduct warranting expulsion, or, at least, exclusion from on-campus dormitories."). Yet even in that case, the D.C. Court of Appeals upheld the trial court's judgment that upon closer inspection, it was not so simple.

Courts in other districts have required expert testimony in similar circumstances. In *A.M.J. v. Royalton Public Schools*, No. CIV 05-2541 (PAM/RLE), 2006 WL 3626979 (D. Minn. Dec. 12, 2006), the district court granted summary judgment in favor of a school district on the plaintiff's negligence claim arising from alleged student-on-student harassment. "Plaintiff's failure to identify an expert to define the duty of care Defendants owed her in the exercise of their professional judgment as school administrators is fatal to her negligence claims." *Id.* at *4.

> [A]n expert is necessary to define the standard of care for the school administrators' exercise of professional judgment in Plaintiff's case. . . . [I]t is beyond the scope of a layperson's knowledge to decide fundamental questions raised by the facts of this case such as whether an investigation was required; what should have been the nature and scope of any such investigation; what were the rights of the accused students, educators, and administrators; were there any applicable privacy limitations; what were the appropriate preventative steps; and what was the appropriate corrective action.

*Id.* at *3.

Plaintiff posits that "a lay jury using common knowledge would be able to ascertain that GW had a duty to protect Miss Prasad as a student on their campus and specifically a student victim of sex-based violence" and "[t]hat they breached that duty when they failed to connect her with appropriate resources and failed to take adequate disciplinary action against her assailant." Dec. 11, 2018 Hr'g Tr. at 67. But this superficial overview does not give the jury any standard to apply, and it is simply an invitation to apply a strict liability theory that would be inconsistent with law. Indeed, the fact that plaintiff could not be more specific demonstrates that it is beyond the scope of a layperson's knowledge to define the nature of the University's duty.

The average juror would be unable to determine what preventative or disciplinary options were available to shield plaintiff from VT, and what sorts of resources or mental health support should have been provided to plaintiff before and after VT was barred from the campus. It is

overly simplistic for the plaintiff to insist that the average juror could simply hear the evidence in this record and apply his or her common sense: would even a thoughtful and dispassionate juror necessarily know what level of response was appropriate at any particular point in this chronology, particularly given how much information about what was actually going on was withheld? What is the standard of care for protecting a victim who refuses to abide by a No Contact Order herself, or who insists that it be lifted? What are the boundaries of a university's authority over the use of social media other than the email accounts under its auspices? What should GW have done once it received copies of the texts that included references to possible ███████████████████ ███████████ and to the troubling physical aspects of their consensual sexual relationship?

What legal impediments are imposed by the statutory and common law rules that protect individual privacy, and how does a school properly adhere to its obligations under the Health Insurance Portability and Accountability Act of 1996 ("HIPAA") and Title IX at the same time? And how should any obligations under Title IX, and the school's discretionary authority to impose disciplinary sanctions, be reasonably balanced against contractual or other obligations, if any, to provide an enrolled student with an education or a degree? What are the limits on a school's ability to separate and counsel young people who are its students but who are also legally adults? At what point and to what extent could the school address the fact that both of these students appear to have struggled with significant mental health issues? Was the university permitted to consider, or inquire into, plaintiff's previous psychiatric history? Or VT's? What about whether he had any prior record of assaultive or stalking behavior? Where and when do the constitutional rights of an accused fit in?

Plaintiff submits that GW's alleged failure to enforce the April 1, 2013 No Contact Order was a breach of duty that caused harm to the plaintiff, Dec. 11, 2018 Hr'g Tr. at 68; but what are

the steps that a reasonably prudent institution would take to enforce an NCO, particularly after the student is no longer enrolled? What was the nature of the duty the school owed the plaintiff after VT was removed from the campus?

Plaintiff's negligence argument includes both a complaint that the school caused her emotional distress by making her repeat her allegations to too many offices, Dec. 11, 2018 Hr'g Tr. at 69, but also the contention that GW breached its duty to care for her mental health when it waited too long to refer her to another office: the one with specific training in Title IX. *Id.* at 73. How could a lay juror untangle this inconsistency?

Given the complexity of all of these questions, the absence of any expert testimony as to what the standard of care would be under these circumstances is fatal to plaintiff's case. Because the Court finds the standard of care to be beyond the ken of the average layperson, and plaintiff did not provide the necessary expert testimony, defendant is entitled to summary judgment on the negligence count. *See Edwards*, 473 F. Supp. 2d at 45 ("When expert testimony is necessary to establish the standard of care, a plaintiff's failure to name an expert constitutes grounds for dismissal.").

### B.     Plaintiff cannot establish causation.

Defendant also moves for judgment on this count on the grounds that plaintiff cannot show that any alleged negligence by GW caused her emotional distress. Def.'s Mem. at 39–41. Plaintiff points to the statement in her medical records that "a significant psychosocial stressor involves being stalked by her ex-boyfriend," █████████████████████████████████, and she contends that that evidence, combined with the fact that GW had the obligation and power to prevent VT from stalking her but failed to do so, is enough to support a finding that GW caused her emotional distress. Pl.'s Reply at 22–23. But plaintiff introduced no expert testimony that

would connect her interactions with University officials or any alleged omissions on GW's part during the periods of time when it was on notice of VT's behavior to her emotional condition, and the evidence she has produced paints a much more complicated picture.

To prevail on the negligent infliction claim, plaintiff must show that "negligent actions or omissions of the defendant . . . in fact, caused serious emotional distress to the plaintiff." *Hedgepeth*, 22 A.3d at 811; *see, e.g.*, *Bradley v. NCAA*, 249 F. Supp. 3d 149, 170 (dismissing plaintiff's negligent infliction of emotional distress claim because she was unable to proffer facts that demonstrated defendant's alleged negligence, rather than her underlying injury, caused her serious emotional distress). Assuming without deciding that GW had a special relationship with plaintiff, the Court holds that plaintiff has not offered evidence showing that GW's alleged negligence, rather than her own underlying mental health conditions and the actions of others, caused her emotional distress.

Plaintiff argues that, in her view, GW caused her emotional distress because it repeatedly required her to report VT's actions to multiple offices; it failed to provide her with specific types of support and resources; it failed to respond to most of her reports about VT; it took "little meaningful action" against VT; and it failed to apprise her of those actions it had taken against him. Pl.'s Opp. at 36–37. She acknowledges that she previously suffered from emotional problems, but she posits that her "emotional distress worsened considerably after she met VT, and even more dramatically after GW became involved." *Id.* at 38. Citing the timeline she prepared for this litigation, she observes that in the spring of 2013, she experienced trouble sleeping, anxiety, depression, and situational mild depression. *Id.*, citing Pl.'s Timeline, Pl.'s Ex. 29, at RFP 0000943. And citing a physician's notes, she asserts that her "severe trauma reactions culminated

in a PTSD diagnosis in February of 2014." ████████████████████████████████████

████████████

But a review of this and other evidence in the record leads to the conclusion that no reasonable fact finder could determine that it was GW that "in fact, caused" plaintiff's emotional distress. *Hedgepeth*, 22 A.3d at 811. The record shows that plaintiff had significant mental health and emotional issues well before she arrived at GW. Prasad Dep. at 242:8–12, 250:1–16; ████

███████████████████████████████████████████████; *see also* Email of Nov. 28, 2012 from Pl. to VT, Def.'s Ex. 18, at AA0004288 (stating "when [she] went to college [she] was a disaster waiting to happen because [she] had all these problems under the surface"). Furthermore, even setting aside any problems she had before she entered the University, plaintiff's own timeline shows that she began experiencing emotional problems as a student well before she reported the March 2013 attack to GW or even brought the harassing emails to its attention. According to her own account, plaintiff began having panic attacks in November 2011. Pl.'s Timeline, Pl.'s Ex. 29, at RFP 000940. After the University imposed the first NCO in January 2012, she "stayed out of contact with [VT] throughout the spring and early summer," but she "developed problems sleeping for the first time" and "began having anxiety attacks more frequently." *Id.* at RFP 000941. ███████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████

████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
███████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████

While GW was informed in January of 2012 that VT had sent harassing messages to plaintiff from London, and it issued the NCO after she reported the messages, plaintiff did not inform the school when she resumed communications with him, and she did not seek assistance dealing with the other traumatic events she experienced in the fall of 2012. As of October 2012, all GW knew was that plaintiff was seeking to have the NCO lifted and that she needed no help with VT. It had not repeatedly required her to report anything, and it had not been provided with information that would have revealed her need for ongoing support or resources.

Plaintiff attributes her emotional distress and her ultimate PTSD diagnosis to GW's handling of VT's harassment, Pl.'s Opp. at 38, citing Physician's Progress Notes, Pl.'s Ex. 102, at AA0014861, but the February 5, 2014 medical record she cites lists a host of other circumstances that combined to contribute to her condition, while making no mention of the University:



 Based on the absence of any expert testimony or other affirmative evidence of causation related to GW, as opposed to VT, and the presence of considerable evidence of multiple pre-existing and unrelated contributing factors, the Court holds that plaintiff lacks the evidence she needs to persuade a reasonable juror that GW caused her emotional distress.

## IV. Plaintiff's Negligent Retention Claim Fails as a Matter of Law Because it is not Predicated on a Common Law Duty that the University is Alleged to have Breached and There is no Allegation of a Tort Committed by Slifka

In Count Five, plaintiff asserts that the University is liable for the negligent retention of OSRR Director Gabriel Slifka because Slifka treated her and other victims of sexual harassment with "callous disregard" and failed to "investigate and address sexual harassment" at GW, and because the school failed to take adequate measures to ensure Slifka followed its written procedures. Compl. ¶¶ 139–46. To be liable for negligently retaining an employee, plaintiff must show that GW "knew or should have known its employee behaved in a dangerous or otherwise incompetent manner, and that the employer, armed with that actual or constructive knowledge, failed to adequately supervise the employee." *Brown v. Argenbright Sec., Inc.*, 782 A.2d 752, 760 (D.C. 2001), quoting *Giles v. Shell Oil Corp.*, 487 A.2d 610, 613 (D.C. 1985).

Relying upon *Islar v. Whole Foods Market Group Inc.*, 217 F. Supp. 3d 261 (D.D.C. 2016), GW argues that the negligent supervision claim fails because plaintiff has not predicated it on a common law cause of action as required by D.C. law. Def.'s Mem. at 42–43. In *Islar*, the district court thoughtfully set out the current state of the law in the District of Columbia on negligent retention. 217 F. Supp. 3d at 265–66. It observed that negligent supervision, like any other negligence count, must be founded upon a breach of duty by the defendant – in this case, GW, the *employer* – and it pointed to the statement in *Griffin v. Acacia Life Ins. Co.*, 925 A.2d 564, 576–77 (D.C. 2007), that a "claim of negligent supervision may be predicated only on common law causes of action or on duties otherwise imposed by the common law;" it cannot be based on the breach of a statutory duty. 217 F. Supp. 3d at 265; *see also Griffin*, 925 A.2d at 576, n.32 ("[A] negligent supervision action requires a breach by the employer of a duty owed to the plaintiff, and . . . this duty must be one imposed by the common law and not by statute."). Applying that reasoning here, plaintiff must establish the existence of a common law duty of care on the part of GW that is separate and apart from Title IX. If she is pointing to Title IX alone, or to the contract,[34] her claim fails.

GW argues that plaintiff has not pointed to any other source of the school's obligation to protect a student from sexual harassment other than Title IX. Def.'s Mem. at 42–43. Plaintiff

_____

34      At the hearing, counsel for plaintiff argued that "a reasonable jury would be instructed that a university has a duty to enforce contractual measures that it takes to protect a student . . . once it enters into those contracts for that student's benefit and its failure to take those steps is a breach of that duty and can result in severe emotional distress." Dec. 11, 2018 Hr'g Tr. at 68. The Court is inclined to agree with the holding in *Islar* that the D.C. Court of Appeals would not permit a negligent retention claim to be predicated on a breach of contract alone, 217 F. Supp. 3d at 266, but it need not decide the issue since it has already concluded that plaintiff cannot establish the alleged breach of contract.

points to case law that she argues establishes that a school owes a student an ordinary duty of care, and she adds that GW was also bound by the same special duty of care that forms the basis of her emotional distress claim:  the duty that GW allegedly undertook to protect her from VT after she complained about his behavior.  Pl.'s Opp. at 40.  But plaintiff paints with such a broad brush, it is difficult to discern any lines of demarcation between this duty and the school's obligations under Title IX, and her allegations of a common law duty here suffer from the same deficiency that marred the negligent infliction claim:  the absence of any expert testimony that defines what the scope of the duty might be.

But even if the school was operating under a clear duty to protect her independent of Title IX, to prove that duty was violated by the retention of Slifka, plaintiff would be required to establish that the school was on notice that he posed some danger to her.  And defendant argues, based on *Islar*, that a plaintiff advancing this claim must demonstrate that the *employee's* conduct was *itself* actionable as a common law tort.  Def.'s Mem. at 43, citing *Islar*, 217 F. Supp. 3d at 267.

As the district court made clear in *Islar,* the D.C. Court of Appeals has not yet explicitly announced such a ruling.  217 F. Supp. 3d at 267.  But the Court agrees with the reasoning in *Islar* that a fair reading of existing D.C. precedent leads to the conclusion that under D.C. law, a negligent supervision claim does require a showing of a tort committed by the supervised

employee, and there is no such evidence here.[35]   In the absence of evidence of tortious conduct

perpetrated by Slifka, plaintiff has not met her burden to prove the negligent supervision of Slifka

– in violation of a duty owed to her – by GW.

In addition, there are significant problems with plaintiff's argument that GW was on notice

of any failures that posed a risk to plaintiff, including ordinary negligence, on the part of Slifka.

Plaintiff cites to two emails regarding Slifka's handling of other reports of sexual harassment at

GW.  Pl.'s Opp. at 42.  The first is an October 2011 email about another student's experience with

the school's response to student-on-student verbal abuse.  ███████████████████████████

██████████████████████████.  The author wrote that after another GW student verbally

abused her based on her sexual orientation and threw a box of pasta at her, the author raised her

arm as if to strike him, but he grabbed her arm and stopped the strike.  *Id.*  Afterward, to the

author's surprise, the University charged her with disorderly conduct for raising her arm to strike

the other student, which Slifka explained was based on the school's zero-tolerance policy toward

violence.  *Id.*  The school later dropped the charge, and the author complained that the University

did not apologize to her for its handling of her complaint.  *Id.*

---

35      Even if the conduct does not have to rise all the way to the level of a tort, the cases plaintiff
relies on involve evidence that the employer was on notice of alleged harassment perpetrated by
the *employee*, which is not the situation here.  *See* Pl.'s Opp. at 43–44, citing *Beyene v. Hilton
Hotels Corp*., 815 F. Supp. 2d 235, 253 n.22 (D.D.C. 2011) (noting evidence of an email from the
plaintiff to his supervisor reporting threats the plaintiff received from a co-worker); Pl.'s Opp. at
44, citing *Gonzales v. N.C. State Univ.*, 189 N.C. App. 740, 745 (2008) (case involving sexual
harassment of students by a professor); *Doe v. Brandeis Univ.*, 177 F. Supp. 3d 561, 614 (D. Mass.
2016) (holding that to overcome a motion to dismiss, the plaintiff needed to allege facts that if true
would show the employer should have known there were problems with an employee but failed to
take further action).

The second email was from a parent to Slifka sent in September 2013 – after most of Slifka's involvement with plaintiff. Email of Sept. 30, 2013 to Slifka, Pl.'s Ex. 122, at AA0013801. The parent was unhappy with the school's handling of conditions that had been imposed on a student in a disciplinary hearing, which the parent complained led to his daughter seeing the student at a fraternity house from which he was barred. *Id.* In response to the email, Slifka wrote to the parent to apologize, said the school temporarily modified the conditions to allow the student temporary access to a particular building, that the modification should have been communicated to the victim, but that the modification did not allow the assailant to be at the fraternity house in any event. Email of Oct. 3, 2013 from Slifka, Def.'s Ex. 80, at AA0013768–69. Slifka stated there had been follow-up with University staff, *id.*, and the parent thanked Slifka, writing, "I think we are heading in the right direction." *Id.* at AA0013767.

Plaintiff also cites a sworn declaration from another student, ███████████████████ ████████████████████, regarding the school's handling of her October 2010 complaint that she was raped by another student. The declarant complains about how the University handled the matter from the outset, but she also states that she initially declined to press charges. ████████████ ████████████████████ (stating she did not name her assailant in her initial report and that GWPD advised her that it would not take any action unless she added his name to the report). She also complains about the procedures involved in the disciplinary proceeding after she decided to name her assailant, and the school's handling of the matter after the hearing. *Id.* ¶¶ 3(d), 4. While the declaration presents a number of complaints about the school's handling of the matter, its only mention of Slifka is that the declarant used a phone in his office to call into the disciplinary hearing rather than have to appear in person in the same room as her assailant: "Mr. Slifka facilitated my

calling in to deliver my testimony, and **at no** point did he explain to me my rights as a complainant during the hearing." *Id.* ¶ 4(a).

While these emails and the declaration present some evidence that various officials at GW were put on notice of the authors' dissatisfaction with its performance and procedures for addressing sexual assaults, none of them show that Slifka "behaved in a dangerous or otherwise incompetent manner." *Beyene v. Hilton Hotels Corp.*, 958 F. Supp. 2d 247, 252 (D.D.C. 2013) (quotation omitted), *aff'd*, 573 F. App'x 1 (D.C. Cir 2014).

Plaintiff also points to an internal GW email exchange regarding her own complaint as evidence that the school was on notice about tortious conduct by Slifka. Pl.'s Opp. at 43, citing Emails of Jul. 24, 2013, Pl.'s Ex. 80, at AA0010685–86. But a reading of the full email exchange does not support plaintiff's argument. On July 24, 2013, after VT's suspension, GWPD Chief Kevin Hay wrote Slifka and GWPD Captain Mark Balazik about VT:

> Based on his gross misconduct ignoring the no contact order and his history. I believe [O]SRR needs to take more affirmative action with this case . . . When you see the evidence collected in the case . . . , we should talk about additional sanctions. We might consider convening a Threat Assessment Team to conclude this matter . . . . His obsessive behavior indicates he will most likely come to GW to stalk Ms. Prasad when classes resume.

*Id.* at AA0010686. In the same email, Hay asked Balazik to confirm VT was barred from campus, and Balazik responded:

> I spoke with Gabe on Friday regarding this matter because I was aware that [VT] was suspended from GW this past semester *but has not been barred from campus.* Usually suspended students are automatically barred at the request of SRR, however an exception was made by OGC in this matter sin[c]e [VT] had only a couple of classes left for his degree and they wanted him to complete his degree requirements online.
>
> When I spoke with Gabe, I asked him to revisit the matter with Toi Carter at OGC since he has no intention of following GW's requirements. (He's also the one suspected of ordering Italian food and sending it to Gabe

immediately following his hearing/suspension from school). Greg Solomon investigated and Mark Levine (copied here) was looking into that one.

I'll get his GWorld for the BOLO. Suz[anne Combs] is working with Ricca in anticipation of her getting a TPO when she returns to DC next month.

*Id.*, at AA0010685–86 (emphasis in original). First, a reading of Balazik's entire email makes clear that Balazik was referring to *VT's* having "no intention of following GW's requirements," not *Slifka*, as plaintiff represents. *See* Pl.'s Opp. at 43 (quoting the email as: "[w]hen I spoke with Gabe [Slifka], I asked him to revisit the matter with Toi Carter at OGC since he [Slifka] has no intention of following GWs requirements"). Balazik wanted Slifka to ask the Office of General Counsel to remove the exception that allowed VT on campus since *VT* had no intention of following's GW's requirements and *VT* was suspected of placing food orders to GW officials. Thus, the email exchange does not show that Slifka was engaged in any tortious conduct, but rather that various offices within GW, including OSRR, GWPD, and OGC, were involved in determining how to address VT's ongoing harassment of both plaintiff and its own staff. And the record shows that shortly after this email exchange, Slifka issued an order barring VT from University property. Interdepartmental Mem. of Jul. 29, 2013, Pl.'s Ex. 81, at AA0001115.

Indeed, as the office responsible for carrying out the University's disciplinary decisions, Slifka Dep. at 35:15–16 ("[T]he University investigates. We remediate."), OSRR regularly received complaints from unhappy students and parents. Pereira Dep. at 279:1–21 ("In the discipline system, you have to realize that everything is contentious. . . . . [T]here's a lot of complaints that come into the discipline system. We are not the most popular people on campus, as you can imagine."). Despite this, discovery in this case uncovered no complaints aside from

the two emails cited by plaintiff concerning the handling of Title IX matters by Slifka, who had worked at GW since 2006. Slifka Dep. at 23:13–15.[36]

Finally, the record shows that plaintiff herself expressed gratitude for Slifka's handling of the matter and advocated to him that the school not suspend VT. ████████████████ ███████████████████████ (writing that Slifka "wanted my opinion. I had no idea that that was what the meeting would be. I really do appreciate it though."); Email of Apr. 16, 2013 from Pl. to Slifka, Pl.'s Ex. 50, at RFP 001338 ("I still think that the best thing for [VT], me, and the GW community would be to allow him to graduate, leave DC, and move on with his life. . . . I know it's a difficult decision. I really do believe there are other better options than suspension though. Thanks again for including me in this process."); Email of Apr. 24, 2013 from Pl. to Slifka, Pl.'s Ex. 26, at AA0000765 ("[W]ith the help of UCC and after my meeting with you, I was able to break it off fully again by the end of that weekend."); Email of May 13, 2013 from Pl. to Slifka, Def.'s Ex. 49, at AA0009306–07 ("I am glad GW has taken the situation between [VT] and me seriously, listened to my complaints, and included my input in the decision-making process. . . . Overall, I do feel like I am leaving this university with the situation having been addressed, so thank you.").

In sum, plaintiff has offered no evidence that the University was on notice that Slifka behaved in a manner that posed a risk to plaintiff.

---

36    Plaintiff also points to a complaint the university received about whether Slifka was properly meeting the school's Title IX obligations, Pl.'s Opp. at 42, but as noted above, a claim for negligent retention cannot be premised on a failure to carry out a statutory obligation.

## CONCLUSION

For the reasons stated above, defendant's motion for summary judgment [Dkt. # 63] will be GRANTED on all four counts, and plaintiff's cross-motion for summary judgment [Dkt. # 81] will be DENIED.  A separate order will issue.

AMY BERMAN JACKSON
United States District Judge

DATE:  May 17, 2019